# 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 𝔠𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰

*for the*

# 𝔗𝔥𝔦𝔯𝔡 𝔠𝔦𝔯𝔠𝔲𝔦𝔱

Case No. 24-1097

VETERANS GUARDIAN VA CLAIM CONSULTING LLC;
JOHN F. RUDMAN; ANDRE JESUS SOTO,

*Plaintiffs-Appellants,*

– v. –

MATTHEW J. PLATKIN, in his official capacity
as Attorney General of New Jersey

*Defendant-Appellee.*

ON APPEAL FROM AN ORDER OF THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY IN CASE NO. 3-23-CV-20660,
HONORABLE MICHAEL A. SHIPP, U.S. DISTRICT JUDGE

## BRIEF OF *AMICUS CURIAE* INSTITUTE FOR JUSTICE IN SUPPORT OF PLAINTIFFS-APPELLANTS

PAUL M. SHERMAN, ESQ.
CHRISTIAN LANSINGER, ESQ.
INSTITUTE FOR JUSTICE
*Counsel for Amicus Curiae*
901 North Glebe Road, Suite 900
Arlington, Virginia 22203
(703) 682-9320

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1(a), the undersigned counsel states that the Institute for Justice (IJ) is not a publicly held corporation and does not have any parent corporation, and that no publicly held corporation owns 10 percent or more of any corporation's stock.

Dated: April 3, 2024                                    /s/ Paul M. Sherman
                                                        Paul M. Sherman

                                                        *Counsel for* Amicus Curiae
                                                        *Institute for Justice*

# TABLE OF CONTENTS

**PAGE**

CORPORATE DISCLOSURE STATEMENT ....................................... ii

TABLE OF AUTHORITIES ................................................. v

IDENTITY AND INTEREST OF AMICUS CURIAE ........................ 1

SUMMARY OF ARGUMENT ............................................. 2

ARGUMENT ............................................................. 4

    I.    Basic First Amendment principles and common objections .................... 5

        A.   Speech vs. Professional Conduct ....................................... 7

        B.   Content-based vs. Content-neutral ................................. 12

        C.   Commercial speech vs. Non-commercial speech ........................... 14

        D.   Paid vs. Unpaid Speech .................................................. 15

        E.   Burdens vs. Bans ................................................. 17

    II.   But what about lawyers? ........................................ 18

    III.  If affirmed, the ruling below threatens all Americans who advise others for a living ............................................ 23

CONCLUSION ............................................................. 28

CERTIFICATE OF COMPLIANCE ...................................... 29

CERTIFICATE OF SERVICE .............................................................................. 30

# TABLE OF AUTHORITIES

PAGE(S)

CASES

*Argello v. City of Lincoln*,
  143 F.3d 1152 (8th Cir. 1998) ..............................................................15

*Berner v. Delahanty*,
  129 F.3d 20 (1st Cir. 1997) ................................................................. 20

*Billups v. City of Charleston*,
  961 F.3d 673 (4th Cir. 2020) ..................................................................16

*Bolger v. Youngs Drug Products Corp.*,
  463 U.S. 60 (1983) ..................................................................................14

*Brokamp v. District of Columbia*,
  No. 20-3574, 2022 WL 681205 (D.D.C. Mar. 7, 2022) ......................................19

*Brokamp v. James*,
  66 F.4th 374 (2d Cir. 2023) ................................................................. 12

*City of Austin v. Reagan Nat'l Advert. of Austin, LLC*,
  596 U.S. 61 (2022) ..................................................................................13

*City of Lakewood v. Plain Dealer Publ'g Co.*,
  486 U.S. 750 (1985) ..................................................................................16

*Conant v. Walters*,
  309 F.3d 629 (9th Cir. 2002) ................................................................. 20

*Del Castillo v. Sec'y, Fla. Dept. of Health*,
  26 F. 4th 1214 (11th Cir. 2022) ........................................................... 8

*Edwards v. District of Columbia*,
  755 F.3d 996 (D.C. Cir. 2014) ........................................................... 21

*Holder v. Humanitarian Law Project,*
 561 U.S. 1 (2010) .......................................................................... *passim*

*In re Primus,*
 436 U.S. 412 (1978) .................................................................... 19

*King v. Governor of New Jersey,*
 767 F.3d 216 (3d Cir. 2014) ..................................................... 9, 11, 15

*Legal Servs. Corp. v. Velazquez,*
 531 U.S. 533 (2001) .................................................................... 19

*NAACP v. Button,*
 371 U.S. 415 (1963) .................................................................... 19

*Nat'l Inst. of Family & Life Advocates v. Becerra,*
 585 U.S. 755 (2018) ...................................................................... *passim*

*Nutt v. Ritter,*
 No. 7:21-CV-00106-M, 2023 WL 9067799 (E.D.N.C. Dec. 20, 2023)..... 8, 25,26

*Otto v. City of Boca Raton,*
 981 F.3d 854 (11th Cir. 2020) .................................................. 2, 8, 9

*Pac. Coast Horseshoeing v. Kirchmeyer,*
 961 F.3d 1062 (9th Cir. 2020) .................................................. 8, 12

*Planned Parenthood of Se. Pa. v. Casey,*
 505 U.S. 833 (1992) .................................................................. 10

*Reed v. Town of Gilbert,*
 576 U.S. 155 (2015) .................................................... 6, 12, 13, 14, 27

*Richwine v. Matuszak,*
 No. 123CV00370HABSLC, 2023 WL 8747471 (N.D. Ind. Dec. 19, 2023),
 *appeal docketed* No. 24-1081 ............................................... 8, 25

*Riley v. Nat'l Fed'n of the Blind*,
   487 U.S. 781 (1988) ...........................................................................16

*Simon & Schuster, Inc. v. Members of the N.Y. State Crime Victims Bd.*,
   502 U.S. 105 (1991) ......................................................................6, 16

*Sorrell v. IMS Health, Inc.*,
   564 U.S. 552 (2011) ...............................................................10, 17, 19

*Tingley v. Ferguson*,
   47 F.4th 1055 (9th Cir. 2022) ........................................................... 8

*United States v. Hansen*,
   599 U.S. 762 (2023).......................................................................... 21

*United States v. Nat'l Treasury Emps. Union*,
   513 U.S. 454 (1995) ...........................................................................16

*United States v. Playboy Ent. Grp., Inc.*,
   529 U.S. 803 (2000).......................................................................6, 17

*United States v. Stevens*,
   559 U.S. 460 (2010) ......................................................................... 21

*Upsolve, Inc. v. James*,
   604 F. Supp. 3d 97 (S.D.N.Y. 2022),
   *appeal docketed* No. 22-1345 (2d Cir. June 22, 2022) .........................8, 19, 20, 27

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*,
   425 U.S. 748 (1976) .......................................................................... 22

## LEGISLATION

New Jersey Senate Bill 3292 (S3292) .................................................11, 13

**OTHER AUTHORITIES**

Derek A. Denckla,
*Nonlawyers and the Unauthorized Practice of Law: An Overview of the Legal and Ethical Parameters*, 67 Fordham L. Rev. 2581 (1999) ....................................21, 22

## IDENTITY AND INTEREST OF AMICUS CURIAE[1]

The Institute for Justice ("IJ") is a nonprofit legal center dedicated to defending the foundations of free society, including the right to free speech. IJ is also the nation's leading legal advocate defending occupational speech—that is, speech, typically in the form of expert advice or information, through which people earn a living. IJ has litigated cases across the country defending diverse speakers who advise others on topics including diet, end-of-life care, engineering, legal problems, parenting issues, and pet care. In that litigation, IJ has encountered a number of common objections to the straightforward application of First Amendment principles urged by Appellants, including those raised by the Appellee and adopted by the court below. IJ believes that all these common objections have definitive answers rooted in binding Supreme Court precedent and that its perspective will assist the Court both in resolving those objections and in understanding the full implications of its ruling in this important case.

---

[1] No party's counsel authored any portion of this brief. No party or person—other than Amicus—contributed money intended to fund preparing or submitting this brief. Appellants consented to the filing of this brief. Appellee takes no position on the filing of this brief.

## SUMMARY OF ARGUMENT

"If speaking to clients is not speech, the world is truly upside down." *Otto v. City of Boca Raton*, 981 F.3d 854, 866 (11th Cir. 2020). Thankfully, in our right-side up world, the First Amendment principles that govern this case are straightforward. Advice, no matter the subject it pertains to, is speech within the scope of the First Amendment's protection. When the government restricts who may give advice on specific topics, or prohibits people from being paid to give advice on specific topics, it has imposed a content-based restriction on speech. And, like all content-based restrictions on speech, those restrictions are subject to strict scrutiny, which requires the government to prove that the restriction is narrowly tailored to serve a compelling government interest.

Applying those well-established First Amendment principles here is just as straightforward. Appellant Veterans Guardian wishes to give paid advice to clients on the subject of veterans' disability benefits. New Jersey law allows Veterans Guardian to give paid advice on any number of subjects, but specifically restricts Veterans Guardian from giving paid advice on the subject of applying for veterans' benefits. That is a content-based restriction on speech, and at the preliminary-injunction stage the government needed to show that it is likely to satisfy strict

2

scrutiny. The government failed to do that, and thus Veterans Guardian was entitled to a preliminary injunction.

Some courts, including the court below, resist this straightforward application of binding First Amendment precedent, raising a number of common objections. As explained below, these objections typically concern topics like the distinction between speech and conduct, the distinction between laws that are content-based and content-neutral, and the distinction between paid and unpaid speech. But Supreme Court precedent supplies answers to all these objections. And those answers all point in the same direction: Expert advice is fully protected speech. In some cases, it may be speech that the government has a particularly strong interest in regulating, but that fact goes to the strength of the government's interest under First Amendment scrutiny. It is not—and cannot be—a reason for courts not to apply that scrutiny.

Why, then, have some courts gotten these cases wrong? Amicus suspects that it is because they are concerned about the implications of applying full First Amendment protection to speech on topics like law and medicine. Some may fear that doing so will make regulating these fields impossible, while others may fear that the government will be prevented from addressing real problems. But these concerns are unfounded. Applying the First Amendment to speech about these

3

important topics will not affect the government's ability to regulate the wide array of non-speech conduct that makes up the vast bulk of these professions or prevent the government from enforcing common consumer-protection laws or disclaimer requirements about a speaker's credentials. Indeed, it will not even prevent the government from directly regulating expert advice when it can show that doing so is the most narrowly tailored means of addressing a compelling government interest.

That is not to say that this Court's ruling will be unimportant. Indeed, faithfully applying these established First Amendment principles here is essential precisely because this Court's ruling will be important for countless speakers throughout the Third Circuit. As examples from Amicus's own litigation show, in today's information-based economy, ever-greater numbers of people earn their living purely by speaking. This Court's ruling will determine, to no small extent, whether this diverse and growing body of speakers will enjoy the full protection of the First Amendment to which they are entitled.

## ARGUMENT

Appellants' opening brief does an excellent job of explaining the First Amendment principles that apply to this case, and Amicus will not recapitulate those arguments at length here. But in Amicus's experience litigating occupational-

4

speech cases across the country, some courts resist this straightforward interpretation of Supreme Court precedent, raising a number of common objections.

Thus, to assist the Court, Amicus will first explain why each of these common objections is foreclosed by binding Supreme Court precedent. Amicus will then explain why this interpretation of Supreme Court precedent is no cause for alarm. Applying the robust protection for speech required under Supreme Court precedent will not deprive the government of tools for addressing genuine problems. Finally, Amicus will explain the implications this Court's ruling will have for other speakers throughout this Circuit, using examples drawn from Amicus's own litigation.

### I.    Basic First Amendment principles and common objections.

The short version of Appellants' free speech argument can be summed up in three points:

- Expert advice is fully protected speech. *See Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 767–68 (2018) (*NIFLA*) (rejecting the professional speech doctrine and holding that speech based on "expert knowledge and judgment" or that is "within the confines of [a] professional relationship" is fully protected); *Holder v. Humanitarian Law Project*, 561 U.S. 1, 27 (2010) (holding that a law prohibiting the provision of "advice derived from 'specialized knowledge'" burdened fully protected speech).

- Laws that regulate speech on specific subjects are content-based, even if those laws are not motivated by hostility to the viewpoint being expressed. *See Reed v. Town of Gilbert*, 576 U.S. 155, 169 (2015) ("[A] speech regulation targeted at specific subject matter is content based even if it does not discriminate among viewpoints within that subject matter.").

- Content-based burdens on speech—including restrictions on being paid for speech—are subject to strict scrutiny, even if they do not ban the speech entirely. *See United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 812 (2000) ("The Government's content-based burdens must satisfy the same rigorous scrutiny as its content-based bans."); *Simon & Schuster, Inc. v. Members of the N.Y. State Crime Victims Bd.*, 502 U.S. 105, 116 (1991) (holding New York's "Son of Sam law" was subject to strict scrutiny because "[i]t singles out income derived from expressive activity for a burden the State places on no other income, and it is directed only at works with a specified content").

Despite the clarity with which the Supreme Court has expressed these principles, though, some lower courts have continued to struggle with them when the First Amendment right to provide expert advice intersects with government power to regulate occupations. In Amicus's experience, this struggle revolves around five topics:

- The distinction between regulations of speech and regulations of professional conduct that incidentally involves speech;

- The distinction between laws that are content-based and laws that are content-neutral;

- The distinction between so-called "commercial speech" and speech that occurs in a commercial context;

6

- The distinction between the First Amendment protection for speech that is paid or unpaid; and

- The distinction between laws that ban speech and laws that merely burden it.

Below, Amicus will show that, for each of these topics, binding Supreme Court precedent provides courts with clear guidance.

## A. Speech vs. Professional Conduct

The Supreme Court's ruling in *NIFLA v. Becerra* confirmed that there is no general exception to the First Amendment for so-called "professional speech." In doing so, that ruling stressed that there are only two circumstances in which the Court has afforded speech uttered by "professionals" reduced First Amendment protection. One is where a law "require[s] professionals to disclose factual, noncontroversial information in their 'commercial speech,'" such as required disclosures in attorney advertisements. 575 U.S. at 768. The other is where the government has regulated "professional conduct, even though that conduct incidentally involves speech." *Id.* In all other circumstances, laws that burden "professional" speech on particular subjects are to be reviewed with the same strict scrutiny that applies to content-based restrictions on any other variety of fully protected speech. *Id.* at 773.

Following *NIFLA*, many lower courts have faithfully extended full protection to what would once have been considered unprotected or lesser-protected "professional" speech.[2] But some lower courts have seized on the special rules that apply to regulation of speech incidental to professional conduct in ways that essentially recreate the now-discredited professional speech doctrine. To do this, they relabel the provision of expert advice—along with associated First Amendment activities like gathering information and forming opinions—as "professional conduct."[3] But this interpretation of speech incidental to conduct conflicts with the Supreme Court's established test for distinguishing speech from conduct, with *NIFLA*'s explanation of that doctrine, and with this Court's

---

[2] *See, e.g.*, *Otto*, 981 F.3d at 861–62 (holding that prohibition on talk therapy regulated fully protected speech); *Pac. Coast Horseshoeing Sch., Inc. v. Kirchmeyer*, 961 F.3d 1062 (9th Cir. 2020) (same; vocational training); *Upsolve, Inc. v. James*, 604 F. Supp. 3d 97 (S.D.N.Y. 2022), *appeal docketed* No. 22-1345 (same; legal advice); *Nutt v. Ritter*, No. 7:21-CV-00106-M, 2023 WL 9067799 (E.D.N.C. Dec. 20, 2023) (same; engineering opinions); *Richwine v. Matuszak*, No. 1:23-CV-00370-HAB-SLC, 2023 WL 8747471 (N.D. Ind. Dec. 19, 2023), *appeal docketed* No. 24-1081 (same; end-of-life advice).

[3] *See, e.g.*, *Del Castillo v. Sec'y, Fla. Dep't of Health*, 26 F.4th 1214, 1225–26 (11th Cir. 2022) (holding that "[a]ssessing a client's nutrition needs, conducting nutrition research, developing a nutrition care system [*i.e.*, proposed dietary recommendations], and integrating information from a nutrition assessment are not speech. They are 'occupational conduct[.]'"); *Tingley v. Ferguson*, 47 F.4th 1055 (9th Cir. 2022) (holding that talk therapy is "professional conduct").

precedent, which has rightly derided this labeling game as "unprincipled and susceptible to manipulation." *King v. Governor of N.J.*, 767 F.3d 216, 228 (3d Cir. 2014), *abrogated on other grounds by NIFLA*, 585 U.S. at 766–68.

Start with the Supreme Court's test for distinguishing speech from conduct. As explained in Appellants' brief, that test is set forth most clearly in the Supreme Court's ruling in *Humanitarian Law Project*, a case that involved the provision of expert legal advice that federal law characterized as "material support" to terrorist groups. *See* Appellants' Br. 26–27. The government contended that "the only thing truly at issue" in that case was "conduct, not speech," and that the law "only incidentally burden[ed] [plaintiffs'] expression." *Humanitarian Law Project*, 561 U.S. at 26. But the Supreme Court emphatically and *unanimously* rejected that argument.[4] As the Court explained, when determining whether a generally applicable law regulates speech or conduct, courts look to the activity "triggering coverage under the statute." *Id.* at 28. When that "conduct" consists of "communicating a message"—including specifically "advice derived from

---

[4] Although three justices dissented from the Court's ultimate ruling on the merits, *Humanitarian Law Project*, 561 U.S. at 40 (Breyer, J., dissenting), all members of the Court agreed that, as applied to the plaintiffs, the federal material support prohibition operated as a direct restriction on speech.

'specialized knowledge'"—that application of the law must be analyzed as a direct restriction on speech. *Id.* at 27–28.

The Supreme Court's ruling in *NIFLA* reinforces this understanding of *Humanitarian Law Project* in two ways. First, *NIFLA* makes clear that regulations of "professional" speech are to be reviewed with "ordinary First Amendment principles," 585 U.S. at 773, and the test set forth in *Humanitarian Law Project* for distinguishing speech from conduct is one of those principles. Second, *NIFLA*'s explanation of the special rules applicable to the regulation of speech incidental to conduct makes clear that those rules apply only when the conduct triggering application of the law is *not* communicative. Thus, the classic example of laws that regulate speech incidental to conduct are laws that require informed consent for abortion. *Id.* at 769–70 (citing *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833 (1992)). Those laws require physicians to speak, but—unlike the law in *Humanitarian Law Project*—that requirement is triggered by non-communicative conduct: performing a surgical procedure. And this is no different from the way the Supreme Court has long applied this rule for speech incidental to regulable non-communicative conduct in other contexts. *See Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011) ("That is why a ban on race-based hiring may require employers to remove 'White Applicants Only' signs; why an ordinance against outdoor fires

10

might forbid burning a flag; and why antitrust laws can prohibit agreements in restraint of trade." (cleaned up)).

Finally, this Court has adopted this understanding of *Humanitarian Law Project*. In *King*, this Court stated that "the argument that verbal communications become 'conduct' when they are used to deliver professional services was rejected by *Humanitarian Law Project*." *King*, 767 F.3d at 228. "Further, the enterprise of labeling certain verbal or written communications 'speech' and others 'conduct' is unprincipled and susceptible to manipulation." *Id.* "Simply put, speech is speech, and it must be analyzed as such for purposes of the First Amendment." *Id.* at 228–29.

This Court should reaffirm those principles here. If expert advice to terrorist groups is fully protected by the First Amendment, it cannot be the case that Veterans Guardian's expert advice to former members of the U.S. military on how to apply for increased disability benefits is any less protected. Under *Humanitarian Law Project*, *NIFLA*, and *King*, New Jersey Senate Bill 3292, P.L. 2023, c. 150 (S3292) imposes a direct—not incidental—burden on speech.

11

## B. Content-based vs. Content-neutral

Another source of potential confusion in cases like this one is the distinction between laws that are content-based and those that are content-neutral.[5] Here, for example, the government may argue that S3292 is content-neutral because New Jersey does not care what advice Veterans Guardian gives its clients and has not adopted its regulation out of disagreement with Veterans Guardian's advice. But as the Supreme Court has explained, "[t]his analysis conflates two distinct but related limitations that the First Amendment places on government regulation of speech." *Reed v. Town of Gilbert*, 576 U.S. 155, 168 (2015). Specifically, it conflates *content*-neutrality and *viewpoint*-neutrality.

As the Supreme Court clarified in *Reed*, viewpoint discrimination is merely a particularly disfavored subset of content discrimination. But "a speech regulation targeted at specific *subject matter* is content based even if it does not discriminate

---

[5] *Compare, e.g.*, *Kirchmeyer*, 961 F.3d at 1071 (holding that a law that regulated postsecondary educational programs only if they were vocational in nature was content based because it distinguishes between programs based on the subject matter of the lessons, "even if [the court] assume[s] that the state has no particular interest in encouraging . . . or suppressing" the type of lesson itself), *with Brokamp v. James*, 66 F.4th 374, 393, 401 (2d Cir. 2023) (holding that a law that regulated only speech "pertaining to a mental disorder or problem" was content neutral because the government "does not license 'views it finds acceptable,' while refusing to license 'less favored or more controversial views'").

12

among viewpoints within that subject matter." *Id.* at 169 (emphasis added); *accord City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 71 (2022) (holding that a location-based on-/off-premises sign restriction was not content-based under *Reed* because it "[did] not single out *any topic or subject matter* for differential treatment" (emphasis added)). Thus, "a law banning the use of sound trucks for political speech—and only political speech—would be a content-based regulation, even if it imposed no limits on the political viewpoints that could be expressed." *Reed*, 576 U.S. at 169.

Applying that principle here, New Jersey's law is plainly content-based as applied to Veterans Guardian. Under S3292, Veterans Guardian may give paid advice on any topic under the sun, except on how to apply for veterans' benefits. In other words, New Jersey has singled out the subject matter of applying for veterans' benefits for unique burdens that do not apply to speech on other subjects. Under *Reed*, that is a content-based regulation of speech.

The Supreme Court's ruling in *Humanitarian Law Project* reinforces this conclusion. There, the Court held that a prohibition on expert advice to terrorist groups that extended to advice *on any topic* was content based merely because it distinguished between "advice derived from 'specialized knowledge'" and advice that "imparts only general or unspecialized knowledge." 561 U.S. at 27. Here, by

13

contrast, the government has singled out advice regarding a single subject for disfavored treatment. Under both *Reed* and *Humanitarian Law Project*, that is a content-based regulation of speech. And like all such regulations, it "is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of 'animus toward the ideas contained' in the regulated speech." *Reed*, 576 U.S. at 165.

### C. Commercial Speech vs. Non-commercial Speech

Another potential source of confusion, evinced by the government below, JA18 n.8, is the distinction between "commercial speech," which the Supreme Court has held is entitled to reduced First Amendment protection, and speech with a commercial *motive*, which the Supreme Court has held is fully protected.

Supreme Court precedent makes clear that the "core notion of commercial speech" is "speech which does no more than propose a commercial transaction." *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66 (1983) (cleaned up). This is distinct from speech that is the subject of that transaction. After all, one can sell a copy of Plato's Republic, but that does not convert the book into lesser-protected commercial speech. And those same principles apply when speech is delivered one-on-one and tailored to the needs of the listener. Thus, as the Eighth Circuit explained in a case involving fortune tellers: "There is a distinct difference between

14

the offer to tell a fortune ('I'll tell your fortune for twenty dollars.'), which is commercial speech, and the actual telling of the fortune ('I see in your future . . . .'), which is not." *Argello v. City of Lincoln*, 143 F.3d 1152, 1153 (8th Cir. 1998).

This Court implicitly recognized this same distinction in *King*, where it compared "professional speech" with the distinct category of "commercial speech." 767 F.3d at 233. Although *NIFLA* has since abrogated *King*'s holding that professional speech is entitled to the reduced protection afforded to commercial speech, this Court had no trouble recognizing that the two categories of speech are distinct.

Applying those same principles here, New Jersey's law regulates more than speech that proposes a commercial transaction. It regulates the fully protected advice that forms the substance of that transaction.

### D. Paid vs. Unpaid Speech

Although less common than the previous objections, the court below seemed particularly confounded by the fact that New Jersey's law applies only to paid speech, leaving Veterans Guardian free to give the same advice if it did not charge for it. *See, e.g.*, JA16.

This objection can be quickly disposed of because it, too, is squarely foreclosed by Supreme Court precedent. "It is well settled that a speaker's rights are not lost merely because compensation is received; a speaker is no less a speaker because he or she is paid to speak." *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 801 (1988). Thus, the Court has repeatedly held that speech is entitled to the same level of protection whether it is sold or given away, and that prohibitions on receiving payment for speech receive the same scrutiny as any other burden on speech.[6] And in the wake of *NIFLA*, other federal appellate courts have applied this reasoning directly to occupational regulations like the one here. *See Billups v. City of Charleston*, 961 F.3d 673, 683 (4th Cir. 2020) (rejecting the argument that a licensing scheme for tour guides "[could not] constitute a burden on protect speech because tour guides who do not charge for their services [could]

---

[6] *See City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 756 n.5 (1985) (explaining that First Amendment protection is the same whether speech is sold or given away); *United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454, 468 (1995) (striking down statute that prohibited speakers from receiving payment); *Simon & Schuster, Inc. v. Members of N.Y. Crime Victims Bd.*, 502 U.S. 105, 116 (1991) (striking down New York's "Son of Sam law" as a "content-based statute" because "[i]t singles out income derived from expressive activity for a burden the State places on no other income, and it is directed only at works with a specified content").

16

give tours without a license" as being "quite beside the point" under Supreme Court precedent).

### E. Burdens vs. Bans

Related to the previous objection, another is that New Jersey's law does not completely prohibit speech on veterans' claims. This argument fails for the same basic reason as the previous argument about paid and unpaid speech. That is because the Supreme Court's multiple decisions striking down prohibitions on receiving payment for speech reflect the more general principles "that the 'distinction between laws burdening and laws banning speech is but a matter of degree' and that the '[g]overnment's content-based burdens must satisfy the same rigorous scrutiny as its content-based bans.'" *Sorrell*, 564 U.S. at 565–66 (quoting *Playboy Ent. Grp., Inc.*, 529 U.S. at 812).

And of course this must be the rule. Were it otherwise, the government could require newspaper publishers to get a license before publishing without triggering First Amendment scrutiny, simply because the licensure requirement does not ban speech outright. That, in turn, would "give[] the States unfettered power to reduce a group's First Amendment rights by simply imposing a licensing requirement." *NIFLA*, 585 U.S. at 773.

## II.    But what about lawyers?

The preceding section addressed all the common legal arguments that are raised in defense of regulations of occupational speech. To the extent the government comes forward with cases applying less than strict scrutiny to such regulations, those cases will invariably conflict with one or more of the binding precedents discussed above.

That raises the question of why some courts are getting these decisions wrong, notwithstanding those clear precedents. In Amicus's experience arguing these cases in front of both more and less receptive judicial panels, the overwhelming sense we have gathered is that some courts are concerned that applying Supreme Court precedent to mean what it says will have dire consequences for other types of expert advice, especially advice concerning law and medicine. These courts seem concerned that applying the First Amendment to all expert advice will mean that the government is powerless to regulate these professions at all. But, as explained below, these concerns are unwarranted. Applying strict scrutiny to regulations that burden what was formerly characterized as "professional speech" will leave most applications of occupational licensing laws unaffected. And even where those laws are affected, holding that strict scrutiny

applies does not prevent the government from addressing demonstrable harms in a narrowly tailored fashion.

To begin, it's worth emphasizing that the "Court *has* applied strict scrutiny to content-based laws that regulate the noncommercial speech of lawyers." *NIFLA*, 585 U.S. at 771 (emphasis added) (citing *NAACP v. Button*, 371 U.S. 415, 438 (1963); *In re Primus*, 436 U.S. 412, 432 (1978); and *Humanitarian Law Project*, 561 U.S. at 27–28); *see also Legal Servs. Corp. v. Velazquez*, 531 U.S. 533 (2001). It has also stressed the danger of content-based regulations "in the fields of medicine and public health, where information can save lives." *NIFLA*, 585 U.S. at 771 (citing *Sorrell*, 564 U.S. at 566). Following *NIFLA*'s abrogation of the professional speech doctrine, the lower courts have applied strict scrutiny not just to laws that burden legal or medical speech by those who hold occupational licenses, but also to laws that burden speech by those who are wholly unlicensed or who wish to speak in jurisdictions where they are not licensed. *Compare Otto v. City of Boca Raton*, 981 F.3d 854, 859 (11th Cir. 2020) (applying strict scrutiny to regulation of talk therapy by licensed talk therapists), *with Brokamp v. District of Columbia*, No. 20-cv-3574, 2022 WL 681205 (D.D.C. Mar. 7, 2022) (applying strict scrutiny to regulation of talk therapy by an out-of-jurisdiction therapist), *and Upsolve*, 604 F. Supp. 3d at

102–03 (applying strict scrutiny to prohibition on non-lawyers providing legal advice about debt collection).

These rulings do not imply that all occupational-licensing laws are unconstitutional under the First Amendment. For example, they have no application to laws that require a license to engage in non-expressive conduct like surgery or the handling of client funds. They are also inapplicable to speech that has independent legal significance when laws aim to regulate the legal effect of that speech rather than the speech itself. Thus, although the First Amendment protects *advising* a patient to take a controlled substance, it does not protect a doctor's prescription that—although communicated in writing—creates a legal entitlement to access that controlled substance. *See Conant v. Walters*, 309 F.3d 629, 635 (9th Cir. 2002). Finally, these cases are largely inapplicable to speech in special government-created forums, such as a lawyer's oral argument before a court. *See, e.g.*, *Berner v. Delahanty*, 129 F.3d 20, 26 (1st Cir. 1997) ("A courthouse—and, especially, a courtroom—is a nonpublic forum.").

Nor does applying the First Amendment to pure advice about law and medicine require the wholesale invalidation of any occupational-licensing scheme simply because some of its applications may violate the First Amendment. Under the Supreme Court's overbreadth doctrine, that severe remedy is necessary only

when "the challenger demonstrates that the statute 'prohibits a substantial amount of protected speech' relative to its 'plainly legitimate sweep.'" *United States v. Hansen*, 599 U.S. 762, 770 (2023). Facial invalidation may sometimes be appropriate—such as when the government licenses the speech of tour guides, *see Edwards v. District of Columbia*, 755 F.3d 996 (D.C. Cir. 2014)—but most licensing laws will have enough applications not triggered solely by speech that facial invalidation would be inappropriate.

Laws punishing malpractice would likewise be unaffected. For one thing, the Supreme Court in *NIFLA* specifically recognized malpractice laws as constitutionally permissible. 585 U.S. at 769. For another, there are strong arguments that laws imposing liability for actually harmful legal or medical advice, like laws imposing liability for defamation, satisfy the historical test set forth in *United States v. Stevens* for identifying exceptions to the First Amendment. 559 U.S. 460, 468 (2010). Medical malpractice (or its substantial equivalent) existed as a private cause of action for centuries before the enactment of the First Amendment, and legal malpractice dates back at least to the Founding Era. By contrast, the licensing of professional advice did not become widespread until the twentieth century. *See* Derek A. Denckla, *Nonlawyers and the Unauthorized Practice of Law: An Overview of the Legal and Ethical Parameters*, 67 Fordham L. Rev. 2581,

2583–85 (1999) (tracing origination of unauthorized-practice-of-law statutes to the early twentieth century).

Applying full First Amendment protection for advice about topics like law and medicine would also leave standard consumer protection laws largely unaffected. For example, those who misrepresent their credentials or what they may be able to accomplish for clients have engaged in either false commercial speech or fraud, both of which are unprotected by the First Amendment. *See Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 771 (1976).

Finally, even for the speech that will be affected—such as expert advice— the government will not be left powerless to address real problems. Holding that burdens on expert advice are content-based restrictions on speech means only that those laws must satisfy strict scrutiny, not that they are per se unconstitutional. And although strict scrutiny is a high bar, it is not insurmountable—indeed, the Supreme Court ultimately upheld the prohibition on expert advice under review in *Humanitarian Law Project* because it concluded the law was a narrowly tailored means of advancing the government's compelling interest in combatting terrorism. 561 U.S. at 39.

In short, nothing that this Court decides here will deprive the government of its general power to regulate non-speech conduct, including non-speech conduct by "professionals." Nor will it deprive the government of the power to regulate even pure speech, where the government can meet the First Amendment's requirements. It will simply mean that the government will be required to treat individualized advice the same way the law has long treated advice published in books. Nobody needs permission from the government to write a book about how to represent oneself in any number of common legal proceedings or how to treat any number of common physical ailments. People without legal or medical licenses do write such books and members of the public read them, consider what they have to offer, and take or leave their advice as they see fit. The sky has not fallen as a result, and there is no reason to believe it will do so if this Court takes the Supreme Court at its word and extends the same protection to individualized expert advice like that offered by Veterans Guardian.

### III.    If affirmed, the ruling below threatens all Americans who advise others for a living.

By contrast, the consequences of affirming the decision below are grave indeed. In today's information-based economy, ever-greater numbers of people earn their living purely by speaking. Some offer advice within more traditional

fields, like psychology or engineering. Others carve out narrow fields of their own, sharing their expertise in matters like veterans' disability claims or end-of-life planning. Under the ruling below, all these speakers can be silenced if the government claims that the "primary purpose" of that censorship is to regulate their broader occupational field, or payment for their advice. *See* JA14–16 (exempting S3292 from First Amendment scrutiny because its "primary purpose" is to prevent advisors like Veterans Guardian from "charging fees" or "receiving compensation" for their advice (emphasis added)).

Those speakers include people like Lauren Richwine of Fort Wayne, Indiana. Lauren is the founder of Death Done Differently, a business through which she helps those with terminal illnesses and their families plan for the final days of life and what will happen after someone dies. She does not embalm or bury remains or do any of the conduct of funeral directors. Instead, she facilitates conversations and provides useful guidance that helps her clients cope with the reality of death, promotes healthy grieving, and ensures that her clients and their families are prepared when the time comes. Even so, the Indiana State Board of Funeral and Cemetery Service informed her that these conversations constituted the illegal, unlicensed "practice of funeral services."

Lauren sought a preliminary injunction under the First Amendment, and the Northern District of Indiana granted her motion. *Richwine*, 2023 WL 8747471, at *18. The court rejected the government's argument that the funeral-licensing laws escape First Amendment scrutiny if they largely restrict conduct "in the abstract." *Id.* at *10. Whatever the government's power to regulate those who embalm or bury human remains, as applied to Lauren, the laws restricted her pure advice. Thus, the court correctly held they were subject to "ordinary First Amendment principles." *Id.* at *14. And which ordinary principles did the court apply? Precisely the same ones that Appellants and Amicus have pressed here: That under precedents like *Humanitarian Law Project*, *NIFLA*, and *Reed*, Indiana's law operated as a content-based regulation of speech subject to strict scrutiny, which it could not survive. *Id.* at *10–16.

Retired engineer Wayne Nutt of North Carolina faced a similar experience at the hands of that state's Board of Examiners for Engineers and Surveyors after he shared his expertise on municipal water systems through spoken testimony and written reports. Once again, the state's licensing board characterized Wayne's speech as the unlicensed "practice" of engineering.

Like Lauren, Wayne went to court to vindicate his First Amendment rights, and he won. *Nutt*, 2023 WL 9067799, at *18. In ruling for Wayne, the court

25

acknowledged that although there are cases where the line between speech and conduct can be fuzzy, Wayne's case did not come close to this line because all his actions involved speaking and writing. *Id.* at *12. These actions are "plainly protected activity." *Id.* And just like in Indiana, it did not matter that the law "generally regulates" professional conduct or targeted an occupation "in the abstract." *Id.* at *14. What mattered was that "the Act *as applied to expert reports* target[ed] 'speech as speech.'" *Id.* And so, here again, the court looked to the ordinary First Amendment principles set forth in *Humanitarian Law Project*, *NIFLA*, and *Reed*. *Id.* at *13–14.

Finally, consider the case of Upsolve, Inc., a nonprofit that trains non-lawyer justice advocates to provide basic legal advice to New Yorkers facing debt-collection actions. Like Veterans Guardian, the justice advocates disclaim any interest in acting as their clients' representative agents or attorneys. *See* JA7, n.4. Instead, they simply want to provide clients with advice on how to fill out a one-page, state-created answer form to ensure that those clients did not lose by default in the often-predatory world of debt-collection lawsuits. They were prohibited from doing so, however, by New York's broad prohibition on the unauthorized practice of law.

Upsolve sought a preliminary injunction against New York's UPL laws and won. *Upsolve*, 604 F. Supp. 3d at 121. To begin, the court recognized that Upsolve's lawsuit was not a facial attack on the state's UPL provisions. *Id.* at 111. Nor could such a facial attack succeed, because "the practice of law has communicative and non-communicative aspects," and courts regularly conclude that UPL statutes, in general, regulate conduct. *Id.* at 112. The justice advocates, however, had presented a "novel" question—"(1) an as-applied challenge to a UPL statute where (2) a plaintiff sought to give pure verbal speech." *Id.* at 113. Under these conditions, the court held that "modern Supreme Court doctrine has foreclosed a reductive approach where laws that are *generally* directed at conduct would avoid First Amendment scrutiny when applied to a particular plaintiff's speech." *Id.* What is that "modern" Supreme Court doctrine? *Humanitarian Law Project*, *NIFLA*, and *Reed*. *Id.* at 113–17.

In short, these speakers prevailed because the courts hearing their cases faithfully applied binding Supreme Court precedent in the manner discussed above. That result is a boon not just to them as speakers, but to those who rely on their advice. For a family facing difficult end-of-life decisions, or an unsophisticated litigant facing a predatory debt-collection lawsuit, this advice may be invaluable.

The same is true for American veterans struggling to get by on fewer disability benefits than they are entitled to, and who turn to Veterans Guardian for advice. Yet the ruling below would deprive all these speakers and listeners of the First Amendment protection to which they are entitled. That result cannot be allowed.

## CONCLUSION

This Court should reverse the decision below and remand with instructions to grant the preliminary injunction.

Dated: April 3, 2024

Respectfully submitted,

/s/ Paul M. Sherman
Paul M. Sherman
Christian W. Lansinger
INSTITUTE FOR JUSTICE
901 N. Glebe Rd., Suite 900
Arlington, VA 22203
psherman@ij.org
clansinger@ij.org

*Counsel for* Amicus Curiae
*Institute for Justice*

## CERTIFICATE OF COMPLIANCE

I certify the following:

1. Every attorney whose names appear on the brief is a member of the bar of this court.

2. This brief complies with the type-volume limitation of Rule 29(a)(5) and Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure because this petition contains 5,934 words.

3. This brief complies with the typeface requirements of Rule 32(a)(5) of the Federal Rules of Appellate Procedure and the type style requirements of Rule 32(a)(6) of the Federal Rules of Appellate Procedure because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14 point Equity A font.

4. A virus detection program has been run on the electronic version of the petition and that no virus was detected. The virus protection program used was Bitdefender Endpoint Security Tools, version 7.9.9.381.

5. An identical copy of this petition was e-filed using the Court's CM/ECF electronic filing system.

Dated: April 3, 2024                      /s/ Paul M. Sherman

*Counsel for* Amicus Curiae
*Institute for Justice*

## CERTIFICATE OF SERVICE

I hereby certify that on April 3, 2024, I caused the foregoing BRIEF OF *AMICUS CURIAE* INSTITUTE FOR JUSTICE IN SUPPORT OF PLAINTIFFS-APPELLANTS to be filed electronically with the Clerk of the Court of the United States Court of Appeals for the Third Circuit by using the Court's CM/ECF system, which will send notice of such filing to all registered CM/ECF users.

 Dated: April 3, 2024                        /s/ Paul M. Sherman
                                             *Counsel for* Amicus Curiae
                                             *Institute for Justice*