# UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

---

No. 24-1097

---

VETERANS GUARDIAN VA CLAIM CONSULTING, LLC, *et al.*,
*Plaintiffs-Appellants*,

v.

MATTHEW J. PLATKIN, in his official capacity as ATTORNEY GENERAL OF NEW JERSEY,
*Defendant-Appellee.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY (No. 3:23-cv-20660)

---

## BRIEF OF DEFENDANT-APPELLEE

---

MATTHEW J. PLATKIN
*Attorney General of New Jersey*

JEREMY M. FEIGENBAUM
*Solicitor General*

MICHAEL L. ZUCKERMAN
*Deputy Solicitor General*

DAVID E. LEIT
*Assistant Attorney General*

JESSICA L. PALMER
ANDREW H. YANG
JOSHUA P. BOHN
MEGHAN K. MUSSO
*Deputy Attorneys General*

Office of the New Jersey
Attorney General
R.J. Hughes Justice Complex
25 Market Street, P.O. Box 080
Trenton, NJ 08625
(609) 789-8684
Michael.Zuckerman@njoag.gov
*Attorneys for Defendant-Appellee*

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................... iii

INTRODUCTION ................................................................................1

STATEMENT OF JURISDICTION.........................................................4

STATEMENT OF ISSUES ...................................................................4

STATEMENT OF RELATED CASES AND PROCEEDINGS ............................4

STATEMENT OF THE CASE................................................................4

      A.    Claims-Agent Accreditation And Other Protections For Veterans.................................................................................4

      B.    Increased Predatory Practices...................................................7

      C.    New Jersey Law. ................................................................10

      D.    This Litigation. .................................................................12

SUMMARY OF ARGUMENT .............................................................14

STANDARD OF REVIEW .................................................................17

ARGUMENT ..................................................................................18

I.    AS THE DISTRICT COURT CORRECTLY HELD, APPELLANTS ARE UNLIKELY TO SUCCEED ON THE MERITS.....................................................................................18

      A.    S3292 Does Not Violate Appellants' Free Speech Rights.................19

            1.    S3292 Does Not Abridge Protected Speech...............................20

                  i.   S3292 Regulates Conduct, Not Speech................................20

                  ii.  Any Speech Regulated Is Integral To Unlawful Conduct......25

            2.    Alternatively, S3292 Survives Means-End Scrutiny...................28

i.  At Most, S3292 Is Subject To Intermediate Scrutiny. ...........28

ii.  S3292 Satisfies Intermediate Scrutiny. ..................................35

3.  Appellants' Remaining Arguments Lack Merit. ........................43

B.  S3292 Does Not Violate Individual Appellants' Petition Or Associational Rights................................................................46

II.  THE EQUITABLE FACTORS ALSO CUT AGAINST GRANTING A PRELIMINARY INJUNCTION. ........................................50

A.  Appellants Have Not Established Irreparable Harm..........................51

B.  The Equities Also Weigh Against Injunctive Relief...........................52

CONCLUSION .................................................................................53

COMBINED CERTIFICATIONS ..........................................................54

# TABLE OF AUTHORITIES

**Cases**

*Abbott v. Perez*,
  585 U.S. 579 (2018) ..................................................................................53

*Acierno v. New Castle Cnty.*,
  40 F.3d 645 (3d Cir. 1994) ................................................................ 51, 52

*Adams v. Freedom Forge Corp.*,
  204 F.3d 475 (3d Cir. 2000) ....................................................................51

*Amalgamated Transit Union Local 85 v. Port. Auth. of Allegheny Cnty.*,
  39 F.4th 95 (3d Cir. 2022) ................................................................. 18, 52

*Bank of Hope v. Miye Chon*,
  938 F.3d 389 (3d Cir. 2019) .............................................................. 34, 42

*Bd. of Trs. of State Univ. of N.Y. v. Fox*,
  492 U.S. 469 (1989) ..................................................................................34

*Billups v. City of Charleston*,
  961 F.3d 673 (4th Cir. 2020) ...................................................................39

*Black United Fund of N.J., Inc. v. Kean*,
  763 F.2d 156 (3d Cir. 1985) .....................................................................52

*Borough of Duryea v. Guarnieri*,
  564 U.S. 379 (2011) .......................................................................... 46, 47

*Brokamp v. District of Columbia*,
  No. 20-3574, 2022 WL 681205 (D.D.C. Mar. 7, 2022) .......................33

*Brokamp v. James*,
  66 F.4th 374 (2d Cir. 2023) ....................................................... 16, 31, 39, 45

*Cap. Associated Indus., Inc. v. Stein*,
  922 F.3d 198 (4th Cir. 2019) ..................................................... 21, 22, 49

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*,
   447 U.S. 557 (1980) ............................................................. 16, 28, 34, 35

*City of Austin v. Reagan Nat'l Advert. of Austin*,
   596 U.S. 61 (2022) ..................................................................... *passim*

*Del Castillo v. Sec'y, Fla. Dep't of Health*,
   26 F.4th 1214 (11th Cir.) ........................................................ 15, 21, 31

*DeLoach v. Bevers*,
   922 F.2d 618 (10th Cir. 1990) ..............................................................48

*Denius v. Dunlap*,
   209 F.3d 944 (7th Cir. 2000) ................................................................48

*Doe ex rel. Doe v. Governor of New Jersey*,
   783 F.3d 150 (3d Cir. 2015) ..................................................................19

*Edenfield v. Fane*,
   507 U.S. 761 (1993) .................................................................... 34, 37

*Elrod v. Burns*,
   427 U.S. 347 (1976) ...............................................................................51

*Expressions Hair Design v. Schneiderman*,
   581 U.S. 37 (2017) ..................................................................... 15, 20, 21

*Feliz v. Kintock Grp.*,
   297 F. App'x 131 (3d Cir. 2008) ..........................................................48

*Fla. Bar v. Went For It, Inc.*,
   515 U.S. 618 (1995) ...............................................................................38

*Frank's GMC Truck Ctr., Inc. v. Gen. Motors Corp.*,
   847 F.2d 100 (3d Cir. 1988) ..................................................................17

*Free Speech Coal., Inc. v. Att'y Gen. United States*,
   825 F.3d 149 (3d Cir. 2016) ..................................................................40

iv

*Gideon v. Wainwright,*
    372 U.S. 335 (1963) ..........................................................................47

*Goldfarb v. Virginia State Bar,*
    421 U.S. 773 (1975) ............................................................ 14, 19, 38

*Greater Philadelphia Chamber of Com. v. City of Philadelphia,*
    949 F.3d 116 (3d Cir. 2020)............................................... *passim*

*Heffner v. Murphy,*
    745 F.3d 56 (3d Cir. 2014)...............................................................36

*Hines v. Lowrey,*
    305 U.S. 85 (1938)...........................................................................46

*Hoffmaster v. Veterans Admin.,*
    444 F.2d 192 (3d Cir. 1971)............................................................45

*Hohe v. Casey,*
    868 F.2d 69 (3d Cir. 1989)..............................................................51

*Holder v. Humanitarian Law Project,*
    561 U.S. 1 (2010) ................................................................ 24, 25, 33

*Kim v. Hanlon,*
    99 F.4th 140 (3d Cir. 2024) ............................................................18

*King v. Governor of the State of N.J.,*
    767 F.3d 216 (3d Cir. 2014)................................................... 24, 25

*Kos Pharms., Inc. v. Andrx Corp.,*
    369 F.3d 700 (3d Cir. 2004).............................................................50

*Ky. W. Va. Gas Co. v. Pa. Pub. Util. Comm'n,*
    837 F.2d 600 (3d Cir. 1988).............................................................47

*Leggett v. Bates,*
    533 F. App'x 57 (3d Cir. 2013) .........................................................8

*Liberty Coins, LLC v. Goodman*,
   748 F.3d 682 (6th Cir. 2014) ...............................................................21

*Locke v. Shore*,
   634 F.3d 1185 (11th Cir. 2011) ............................................ 21, 31, 37

*Lowe v. SEC*,
   472 U.S. 181 (1985)...........................................................................20

*Martin v. Lauer*,
   686 F.2d 24 (D.C. Cir. 1982) ............................................................48

*Matter of Felmeister*,
   471 A.2d 775 (N.J. 1984)...................................................................51

*Mazo v. N.J. Sec'y of State*,
   54 F.4th 124 (3d Cir. 2022) ...................................................... *passim*

*Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n*,
   457 U.S. 423 (1982).........................................................................36

*Nat'l Ass'n for Advancement of Psychoanalysis v. Cal. Bd. of Psychology*,
   228 F.3d 1043 (9th Cir. 2000) ..........................................................31

*Nat'l Ass'n for the Advancement of Multijurisdiction Prac. v. Castille*,
   799 F.3d 216 (3d Cir. 2015).................................................... *passim*

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra*,
   585 U.S. 755 (2018).........................................................................20

*Nken v. Holder*,
   556 U.S. 418 (2009).........................................................................52

*Nutt v. Ritter*,
   ___ F. Supp. 3d ___, 2023 WL 9067799 (E.D.N.C. Dec. 20, 2023)....................33

*Otto v. City of Boca Raton*,
   981 F.3d 854 (11th Cir. 2020) ..........................................................31

*Pacific Coast Horseshoeing School, Inc. v. Kirchmeyer*,
    961 F.3d 1062 (9th Cir. 2020) ...............................................................33

*Pitt News v. Pappert*,
    379 F.3d 96 (3d Cir. 2004)........................................................... 23, 24

*Pittsburgh Press Co. v. Pittsburgh Comm'n on Hum. Rels.*,
    413 U.S. 376 (1973).................................................................................26

*Rad v. Att'y Gen. U.S.*,
    983 F.3d 651 (3d Cir. 2010)..................................................................44

*Reed v. Town of Gilbert*,
    576 U.S. 155 (2015).......................................................... 5, 29, 32

*Reilly v. City of Harrisburg*,
    858 F.3d 173 (3d Cir. 2017)........................................................ 18, 50

*Richwine v. Matuszak*,
    ___ F. Supp. 3d ___, 2023 WL 8747471 (N.D. Ind. Dec. 19, 2023) ...................33

*Roberts v. U.S. Jaycees*,
    468 U.S. 609 (1984).................................................................................49

*Rumsfeld v. FAIR*,
    547 U.S. 47 (2006)......................................................................... 13, 22

*S.F. Arts & Athletics v. U.S. Olympic Comm.*,
    483 U.S. 522 (1987)...................................................................... 28, 42

*Scahill v. District of Columbia*,
    909 F.3d 1177 (D.C. Cir. 2018)............................................................49

*Schrader v. Dist. Att'y of York Cnty.*,
    74 F.4th 120 (3d Cir. 2023) ...................................................................18

*Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*,
    502 U.S. 105 (1991)..................................................................................23

*Sorrell v. IMS Health Inc.*,
   564 U.S. 552 (2011) ............................................................................24

*Stanley v. Georgia*,
   394 U.S. 557 (1969) ............................................................................19

*Thomas v. Collins*,
   323 U.S. 516 (1945) ............................................................ 18, 36, 53

*Turner Broadcasting System v. FCC*,
   512 U.S. 622 (1994) ............................................................................39

*United Mine Workers of Am., Dist. 12 v. Illinois State Bar Ass'n*,
   389 U.S. 217 (1967) ............................................................................48

*United States v. Hall*,
   98 U.S. 343 (1878) ............................................................... 5, 6, 46, 53

*United States v. Hansen*,
   599 U.S. 762 (2023) ............................................................ 25, 43, 44

*United States v. O'Brien*,
   391 U.S. 367 (1968) ................................................................... *passim*

*United States v. Williams*,
   553 U.S. 285 (2008) ............................................................................43

*Upsolve, Inc. v. James*,
   604 F. Supp. 3d 97 (S.D.N.Y. 2022) ............................................ 33, 41

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council*,
   425 U.S. 748 (1976) ............................................................... 19, 36

*Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*,
   455 U.S. 489 (1982) ............................................................................44

*Walters v. Nat'l Ass'n of Radiation Survivors*,
   473 U.S. 305 (1985) ................................................................... *passim*

*Young v. Ricketts*,
  825 F.3d 487 (8th Cir. 2016) ............................................................ 9, 21, 22, 31

**Statutes**

28 U.S.C. § 1292 ............................................................................................4

28 U.S.C. § 1331 ............................................................................................4

38 U.S.C. § 5901 ................................................................................. *passim*

38 U.S.C. § 5904 ................................................................................. *passim*

815 Ill. Comp. Stat. 505/2YYY ...................................................................10

Honoring Our PACT Act of 2022, Pub. L. No. 117-168, 136 Stat. 1759 ................8

Iowa Code § 546B.3........................................................................................10

Me. Rev. Stat. Ann. tit. 37-B, § 12 ..............................................................10

N.J. Stat. Ann. § 2C:21-22 ...........................................................................32

N.J. Stat. Ann. § 45:14-B-5...........................................................................32

N.J. Stat. Ann. § 45:15BB-4 .........................................................................32

N.J. Stat. Ann. § 45:2D-8...............................................................................32

N.J. Stat. Ann. § 56:8-228.............................................................. 1, 11, 44

N.J. Stat. Ann. §§ 56:8-1, et seq. ............................................... 10, 11, 39

N.Y. Gen. Bus. Law § 349.............................................................................10

Public Law 2023, c. 150 ..................................................................... *passim*

Wash. Rev. Code § 19.335.020......................................................................10

World War Veterans Act of 1924, 43 Stat. 607, ch. 320............................5

**Regulations**

38 C.F.R. § 14.626 ....................................................................5

38 C.F.R. § 14.629 ............................................................... *passim*

38 C.F.R. § 14.636 ............................................................ 5, 6, 11

**Court Rules**

Fed. R. Evid. 201 ...................................................................8

**Other Authorities**

65 Cong. Rec. 7854, 68th Cong., 1st Sess. (1924) ....................5

*Beard v. VG Consulting*, No. 23-1080 (M.D.N.C.) ....................9

Black's Law Dictionary (11th ed. 2019) ..................................27

*Ford v. Veterans Guardian VA Claim Consulting*, No. 23-756 (M.D.N.C.) ...........8

*Ford v. VG Consulting*, No. 23-756 (M.D.N.C.) .......................9

H.R. 1139, 117th Cong. (2023)................................................10

Hr'g on A119 Before Sen. Comm. on Military & Veterans' Affair,
   June 12, 2023, https://tinyurl.com/mwtzspxw .......................11

Lisa Rein, *Veterans Became Eligible For Billions. These Firms Saw a Chance to
   Profit.*, Wash. Post (May 23, 2024), https://tinyurl.com/5n83h6ed ...................41

*Patterson v. VG Consulting*, No. 23-762 (M.D.N.C.) .............9

S. 740, 117th Cong. (2023).....................................................10

*United States ex rel. Carico v. VG Consulting*, No. 1:20-cv-784 (M.D.N.C.)..........9

*Young VG Consulting*, No. 24-14 (D. Mont.)..........................9

## **INTRODUCTION**

Courts have long recognized that the States have "broad power to establish standards for licensing practitioners and regulating the practice of professions." *E.g., Nat'l Ass'n for the Advancement of Multijurisdiction Prac. v. Castille*, 799 F.3d 216, 221 (3d Cir. 2015). Public Law 2023, c. 150—known as S3292—is precisely such a law. Under federal law, someone who wishes to charge a veteran money for assisting in applying for U.S. Department of Veterans Affairs (VA) benefits must first obtain accreditation from VA, which ensures that they have the proper qualifications and experience, and prohibits predatory financial practices. *See* 38 U.S.C. §§ 5901(a), 5904(c). But VA lacks the authority to enforce its requirements against those who would flout them. So New Jersey, like other States, has filled that gap: as Appellants primarily challenge here, state law forbids unaccredited providers from charging veterans for assistance with VA disability-benefits applications "except as permitted under federal law," and allows for civil enforcement under New Jersey's Consumer Fraud Act. *See* N.J. Stat. Ann. § 56:8-228(a)(1), (4).

There are good reasons for these consumer protections. Between 2018 and 2022, more than 40 percent of VA complaints by veterans were against providers not accredited under federal law. And after VA expanded disability benefits in 2022, a new influx of predatory practices targeting veterans arose. Indeed, in 2022 alone, "benefits consultants" and similar businesses had defrauded veterans of over $414

1

million, and the Federal Trade Commission (FTC) received more than 195,000 complaints about fraud and illegal business practices. New Jersey is not immune from such problems, as the record below confirmed.

Although Veterans Guardian VA Claim Consulting, LLC ("VG Consulting") and two former customers demand a preliminary injunction against S3292, their First Amendment claims are not likely to succeed. States often require professionals to satisfy neutral licensing requirements before charging money, but VG Consulting claims that such laws must meet strict scrutiny to do so anytime the professional's work involves speech—here, aiding and advising clients seeking VA benefits. That is wrong: although such regulations are commonplace—from the requirement that attorneys be barred, to licensing laws that govern psychologists, nutritionists, and real-estate agents, all of whom speak and write as part of their work—no appellate court has subjected such a general licensing requirement to strict scrutiny. Nor do Appellants cite a single case invalidating any comparable measure on free-speech grounds. This Court should decline their extraordinary request to prevent States from enforcing neutral accreditation and consumer-protection measures like this one.

Indeed, the opinions evaluating and rejecting analogous claims have identified multiple flaws in VG Consulting's analysis. *First*, an accreditation requirement does not regulate protected speech but conduct—the act of seeking payment without first obtaining accreditation, much as would apply to a psychologist who seeks lucrative

work where she is unlicensed. Moreover, to the degree S3292 covers speech, the speech is integral to unlawful conduct; it is intertwined with VG Consulting's effort to charge money for services that are illegal under federal law. *Second*, even if S3292 regulated protected speech, it would survive scrutiny. S3292 is both content-neutral and at most a restriction on commercial speech, like other accreditation requirements that are wholly agnostic as to content and target only economically motivated speech that promotes a particular service. And it easily withstands intermediate scrutiny, given the paramount interests—protecting veterans from fraudulent and substandard service—that the law serves, the gap left by federal law, and S3292's tailored nature. Nor is that outcome surprising; S3292 fits a tradition of protecting veterans' benefits from predatory actors dating back to the founding. Appellants' remaining claims all either misunderstand the rights invoked or fail for similar reasons.

Appellants' failures on the merits are enough to dispose of this application for a preliminary injunction, as the district court noted below. But if this Court considers the equitable factors, Appellants have failed to establish irreparable harm, and the balance of the equities and public interest cut heavily against the extraordinary relief they seek. New Jersey has a substantial interest in protecting veterans from predatory actors and substandard services, and S3292 offers a tailored mechanism to enforce existing federal law in service of that interest. The district court correctly found that a preliminary injunction was unwarranted, and this Court should affirm.

## STATEMENT OF JURISDICTION

The district court had subject-matter jurisdiction under 28 U.S.C. § 1331. This Court has subject-matter jurisdiction under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF ISSUES

I.       Whether the district court correctly found that Appellants are unlikely to succeed on their First Amendment speech, petition, and association claims.

II.      Whether Appellants have demonstrated irreparable harm or shown that the remaining equities weigh in favor of a preliminary injunction.

## STATEMENT OF RELATED CASES AND PROCEEDINGS

In addition to the cases reported by Appellants, the State is aware of an action against VG Consulting alleging violations of the federal False Claims Act. *See United States ex rel. Carico v. Veterans Guardian VA Claim Consulting, LLC*, No. 1:20-cv-784-TDS-LPA (M.D.N.C.).

## STATEMENT OF THE CASE

### A.     Claims-Agent Accreditation And Other Protections For Veterans.

"Congress began providing veterans pensions in early 1789," *Walters v. Nat'l Ass'n of Radiation Survivors*, 473 U.S. 305, 309 (1985), and for virtually as long, the Federal Government has taken pains to ensure that funding due to veterans makes its way into their pockets, rather than falling victim to "misappropriation, fraud, and unauthorized conversion to the use of another," *United States v. Hall*, 98 U.S. 343,

349 (1878); *see id.* at 349-54 (recounting series of regulations from 1792 to 1870, an "unchallenged practice of the legislative department of the government, with the sanction of every President, including the Father of the Country"). And for a century, the Federal Government has also endeavored to prevent such fraud and predatory practices in the first place, by requiring claims agents to be accredited by VA, and regulating the compensation they can receive. *See* World War Veterans Act of 1924, 43 Stat. 607, ch. 320, § 19; *see also* 65 Cong. Rec. 7854, 68th Cong., 1st Sess. (1924) (remarks of Mr. Reed) (recognizing that "there are more than 100 associations or organizations that call themselves 'welfare organizations' in some connection with veterans, some of which, I am sorry to say, are nothing more or less than an excuse to furnish an office and a salary here at Washington").

Federal law today continues that longstanding tradition. Most relevant here, federal law prohibits unaccredited individuals from assisting with the preparation of VA benefits claims. *See* 38 U.S.C. § 5901(a) ("no individual may act as an agent or attorney in the preparation, presentation, or prosecution of any" VA claim without accreditation); 38 C.F.R. § 14.629(b)(1) (same); *id.* § 14.636 (b) ("[o]nly accredited agents and attorneys may receive fees"). That requirement "ensure[s] that claimants for [VA] benefits have responsible, qualified representation in the preparation, presentation, and prosecution of claims for veterans' benefits." 38 C.F.R. § 14.626. Federal law also prohibits certain predatory fee structures, including for accredited

providers. *See* 38 U.S.C. § 5904(c)(1) (prohibiting fees "with respect to services provided before the date on which a claimant is provided notice of" VA's initial decision); 38 C.F.R. § 14.636(b) (same); 38 U.S.C. § 5904(d)(1) (contingent fees may be based on "past due benefits awarded on the basis of the claim," but that such fees "may not exceed 20 percent of the total amount of any past-due benefits awarded"); *id.* § 5904(a)(5) ("[a] fee that does not exceed 20 percent of the past due amount of benefits awarded" is presumed to be reasonable); 38 C.F.R. § 14.636(f) (same); *cf. Hall*, 98 U.S. at 354-55 (after recounting laws back to 1792, observing that "most of these regulations have been enacted to prevent agents, attorneys, and guardians from withholding the fund or converting the same to their own use before it passes into the hands of the beneficiary," and observing that "none, it is presumed, will deny the power of Congress to legislate to the end to prevent the agent, attorney, or guardian from converting the same to his use").

Accreditation turns on qualifications, competency, and character. To become accredited, an individual must: (1) show that they are "of good moral character and in good repute, [] qualified to render claimants valuable service, and [] otherwise competent to assist claimants in presenting claims"; (2) show that they "have such level of experience or specialized training as [VA] shall specify"; and (3) "certify to [VA] that the individual has satisfied any qualifications and standards prescribed by [VA]." 38 U.S.C. § 5904(a)(2). Accreditation thus requires an application and self-

certification, "an affirmative determination of character and fitness by VA, and a written examination." 38 C.F.R. § 14.629(b)(1)(i). It also requires, for attorneys and non-attorneys, "qualifying continuing legal education" (CLE) on initial accreditation and on an ongoing basis thereafter. *Id.* § 14.629(b)(1)(iii). If a provider falls below VA standards—such as by engaging "in any unlawful, unprofessional, or dishonest practice"; deceiving, misleading, or threatening "an actual or prospective claimant"; or charging "excessive or unreasonable fees"—VA can "suspend or exclude them from further practice." 38 U.S.C. § 5904(b).

VA has also provided guidance on what constitutes "preparation" of a claim. Specifically, VA has explained that it considers "providing advice to veterans about the information needed to substantiate their claims … to be in furtherance of the preparation and presentation of VA benefits claims, and thus, prohibited without first achieving VA accreditation." JA241. VA has stressed that "[a]dvising a claimant on a specific benefit claim or directing the claimant on how to fill out the application, even if you never put pen to paper, is considered claims preparation." JA290.

### B.    Increased Predatory Practices.

As of 2019, about 350,000 veterans lived in New Jersey—about 4.4% of the State's adult population. JA192. Over 60,000 receive disability compensation. *Id.* Many accredited advisors assist veterans with VA claims, and a network of veterans' service organizations provide such services for free. JA195-97.

In 2022, the Federal Government substantially expanded disability benefits for veterans, adding more than 20 medical conditions that are now presumed to be connected to military service. *See* Honoring Our PACT Act of 2022, Pub. L. No. 117-168, 136 Stat. 1759; JA199-209. In February 2023, the Consumer Financial Protection Bureau warned that this expansion had fueled an influx of predatory practices that targeted veterans. JA209-12. The FTC reported that, in 2022, "benefits consultants" and similar businesses had defrauded veterans of over $414 million. JA217. VA also reported that more than 40 percent of all VA complaints received between 2018 and 2022 by veterans were against unaccredited providers. JA236.

VA has warned a number of entities that it violates federal law to assist claimants in the preparation, presentation, or prosecution of their VA benefits claims without accreditation, *see, e.g.*, JA261-70—indeed, it has said as much to VG Consulting directly, *see* ECF No. 21-1, Letter from VA to VG Consulting (Jan. 16, 2019), *Ford v. Veterans Guardian VA Claim Consulting*, No. 23-756 (M.D.N.C.) (Letter).[1] And in denying accreditation to applicants engaged in similar practices, VA has rejected the idea there is "a legal distinction between providing advice to

---

[1] This Court can take judicial notice of this document in that its existence "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2); *see, e.g.*, *Leggett v. Bates*, 533 F. App'x 57, 58 n.2 (3d Cir. 2013) (taking judicial notice of complaint attached to filing on a federal-court docket in a different matter).

veterans about the information needed to substantiate their claims and filing the claim under [one's] own name," calling this "a distinction without a difference," since "both types of work are considered to be in furtherance of the preparation and presentation of VA benefits claims" and thus require accreditation. JA241.

Multiple lawsuits have been filed claiming that various entities are violating these prohibitions. As VG Consulting admits, Br.3, it is currently a defendant in four pending federal lawsuits, including three class actions, alleging that it is charging illegal fees in violation of federal and state law. *See Patterson v. VG Consulting*, No. 23-762 (M.D.N.C.); *Beard v. VG Consulting*, No. 23-1080 (M.D.N.C.); *Ford v. VG Consulting*, No. 23-756 (M.D.N.C.); *Young v. VG Consulting*, No. 24-14 (D. Mont.); *see also United States ex rel. Carico v. VG Consulting*, No. 1:20-cv-784 (M.D.N.C.) (alleging violation of False Claims Act). For example, one plaintiff-veteran alleges VG Consulting charged her a fee of five times the increase in her monthly disability benefits—not only on the increase from the claim VG Consulting had prepared, but also on additional claims plaintiff had prepared herself even after she had ceased using VG Consulting's services. *See Patterson* Compl. ¶¶ 26-39. Another alleges that VG Consulting charged her "over fifteen times or over 1,500% the allowable fees permitted by federal law." *Ford* Compl. ¶ 76.

Federal law does not, however, currently grant VA the power to enforce these requirements. *See* JA537. To be sure, legislative amendments are under discussion.

The GUARD VA Benefits Act ("GUARD Act"), introduced in the House and Senate as H.R. 1139 and S. 740, would amend federal law to allow imposition of fines where unaccredited individuals or companies charge fees for veterans' benefits assistance or representation. *See* H.R. 1139, 117th Cong. (2023); S. 740, 117th Cong. (2023). As H.R. 1139's lead sponsor has put it, the GUARD Act responds to the "troubling increase of unaccredited claims consultants looking to profit from veterans disability claims," who "peddle a for-profit model for services that veterans can receive free of charge from veteran service organizations." JA298. But the GUARD Act has not yet been enacted. And without such an amendment, VA has acknowledged that it must presently rely on "federal, state, and local enforcement agencies ... for possible prosecution under their laws." JA537.

### C.    New Jersey Law.

New Jersey, like a growing number of States, has stepped in to fill the gap by enacting P.L. 2023, ch. 150 (S3292), which amends New Jersey's Consumer Fraud Act (CFA), N.J. Stat. Ann. §§ 56:8-1, *et seq.*, to allow the State to initiate civil actions against entities that charge money for claims assistance that is not permitted by federal law, *id.* § 56:8-228(a)(1); *see also* N.Y. Gen. Bus. Law § 349-f; 815 Ill. Comp. Stat. 505/2YYY; Iowa Code § 546B.3; Wash. Rev. Code § 19.335.020; Me. Rev. Stat. Ann. tit. 37-B, § 12(2). On June 12, 2023, the Senate Committee on Military and Veterans' Affairs heard testimony concerning scams and exploitive

10

schemes facing the military community. A Veterans of Foreign Wars representative spoke about the need for S3292—testifying about the growing harms caused by unaccredited "claim sharks" and VA's current lack of enforcement authority specifically—and urged New Jersey to pass the bill to "protect[] veterans from this." *See* Hr'g on A119 Before Sen. Comm. on Military & Veterans' Affairs, from 10:40-15:30, June 12, 2023, https://tinyurl.com/mwtzspxw. The full Legislature unanimously followed suit, and the bill was signed into law that August. JA521.

As relevant here, S3292 allows New Jersey to vindicate federal law by prohibiting any person from receiving "compensation for advising or assisting any individual with regard to any veterans benefits matter, except as permitted under federal law," and prohibiting "compensation for any services rendered before the date on which a notice of disagreement is filed with respect to the individual's case." *See* N.J. Stat. Ann. § 56:8-228(a)(1), (4). These requirements mirror federal law. *Compare* 38 U.S.C. § 5901(a) (requiring accreditation); *id.* § 5904(c)(1) (restricting charging fees for services before initial denial); 38 C.F.R. §§ 14.629(b)(1), 14.636(b) (prohibiting unaccredited entities from charging fees). S3292 also includes other consumer protections tethered to federal law, such as a restriction on charging fees that are "excessive or unreasonable" in light of "[t]he factors articulated within 38 C.F.R. § 14.636." N.J. Stat. Ann. § 56:8-228(a)(6). S3292 makes these and other provisions actionable under the CFA, *id.* § 56:8-228(c), and thus allows New Jersey

to do what VA currently cannot: file civil actions against those who operate in New Jersey as unaccredited "claim sharks," JA536, in violation of federal law.

### D.     This Litigation.

Appellant VG Consulting is a nationwide business that markets its services to veterans "who plan to petition the VA for disability benefits." JA30 ¶ 3; *see* JA33 ¶ 10. VG Consulting profits by charging a contingent fee: if a veteran is successful in pursuing claims, "the fee is the difference between the monthly amount of benefits received pre-claim and the amount the veteran will receive post-claim, multiplied by five." JA41 ¶ 39. It uses "[i]ndividual specialists [who] assist clients in developing claims by, among other things, reviewing relevant documents, helping develop supporting evidence, identifying claim strategies, and advising on how to prepare and submit a claim." JA39 ¶ 32. VG Consulting is not accredited by VA. JA40-41 ¶¶ 36-38. Appellants Rudman and Soto are veterans who would like to work with VG Consulting. JA42-46 ¶¶ 42-65.

Appellants filed suit, seeking a declaration that aspects of S3292 violate their First Amendment rights, and an order enjoining enforcement. JA57. Appellants all alleged a violation of their rights to free speech (Count 1), JA55-56 ¶¶ 95-101, while Rudman and Soto also claimed that S3292 violates their rights to petition the government and to associate for that purpose (Count 2), JA56-57 ¶¶ 102-07.

Appellants sought both facial and as-applied relief, JA54-55 ¶¶ 91-94, and moved for a preliminary injunction on September 26, 2023, JA61.

On January 5, 2024, the district court denied the motion, finding a lack of likelihood of success on the merits. JA2, 4, 21. As an initial matter, the court held that S3292 does not violate Appellants' right to free speech because it regulates conduct, not speech. JA14. Regulations of conduct, the district court explained, "govern what a person 'must *do*,'" rather than "what they may or may not *say*." JA13 (quoting *Rumsfeld v. FAIR*, 547 U.S. 47, 60 (2006)). The court held that "[t]he law's primary purpose is to prevent unaccredited agents from *charging fees* for unaccredited services," meaning any regulation of speech "is merely incidental to the conduct that New Jersey is actively seeking to regulate." JA14.

Alternatively, even assuming that S3292 did regulate protected speech, the court found it content-neutral because it is "unconcerned with the message or words that are conveyed by [VG Consulting] and its agents"; there was "no indication that the law was designed to suppress any subject matter, opinion, or concept"; and "[i]t does not express disagreement with any particular message." JA16.

Having found the law content-neutral, the district court then held that S3292 withstands intermediate scrutiny. JA16-19. The court found that S3292 furthers the substantial interest in protecting veterans from predatory practices, and cited federal statistics in support. JA17-18. The court held that "S3292 advances the State's

interest by ensuring that New Jersey veterans are assisted only by those who have been VA-accredited, to align with the requirements under federal law." JA18. The court then held "S3292 is not broader than necessary to serve New Jersey's interests in protecting its veterans." *Id.* Rather, it is "sufficiently tailored, as it aligns with existing federal law and tracks the State's interest in vindicating federal law in New Jersey in the absence of any VA enforcement tools." *Id.*

The district court also found the remaining claims unlikely to succeed. It held that S3292 does not violate Rudman's and Soto's rights to petition the government or to associate, JA19-20, and that S3292 is neither overbroad nor unconstitutional as applied to VG Consulting, JA21. Because Appellants had failed to show a likelihood of success, they were not entitled to a preliminary injunction, and there was no need for the court to examine the remaining equitable factors. *Id.*

This appeal followed.

## SUMMARY OF ARGUMENT

I. Appellants are unlikely to prevail on the merits because S3292 violates neither their free-speech rights nor Rudman's and Soto's petition and association rights. Their theories would upend reams of precedent, contravening States' "broad power to establish standards for licensing practitioners and regulating the practice of professions." *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 792 (1975).

A. S3292 does not violate the Speech Clause, either facially or as applied.

1. Initially, S3292's requirements do not burden protected speech, for two reasons. *First*, its accreditation requirement regulates conduct, not speech, and any "effect on speech" is "only incidental to its primary effect on conduct." *Expressions Hair Design v. Schneiderman*, 581 U.S. 37, 47 (2017). It is thus no different from accreditation requirements for other professions that happen to involve speech, such as law, psychology, or real estate, which other circuits have identified as regulating conduct. *See, e.g.*, *Del Castillo v. Sec'y, Fla. Dep't of Health*, 26 F.4th 1214, 1220 (11th Cir.), *cert. denied sub nom. Heather Kokesch Del Castillo v. Ladapo*, 143 S. Ct. 486 (2022) (dieticians and nutritionists). *Second*, any affected speech is speech integral to unlawful conduct. VG Consulting's business model violates federal law, and S3292 provides New Jersey with civil authority to respond. Appellants do not challenge federal law, arguing only that they are not covered by its terms. But that is hard to square with their admitted activities, and VA itself is clear that companies like VG Consulting are violating federal law.

2. Even if S3292 burdened protected speech, it would at most be subject to, and survive, intermediate scrutiny. Such scrutiny is proper for two independent reasons. *First*, S3292 is content-neutral. A speech restriction is content-neutral so long as it "is 'agnostic as to content'" and thus "'requires an examination of speech only in service of drawing neutral' lines." *Mazo v. N.J. Sec'y of State*, 54 F.4th 124,

149 (3d Cir. 2022) (quoting *City of Austin v. Reagan Nat'l Advert. of Austin*, 596

U.S. 61, 69 (2022)). Accreditation requirements like S3292 pass that test; while they

are naturally limited to the services they cover (and thus to relevant speech spoken

in that industry), they serve the neutral goal of ensuring that consumers of those

services are not victimized by predatory or substandard providers. *E.g.*, *Castille*, 799

F.3d at 221; *Brokamp v. James*, 66 F.4th 374, 398-403 (2d Cir. 2023), *cert. denied*,

144 S. Ct. 1095 (2024). *Second*, the challenged law applies to commercial speech—

that is, VG Consulting's discussion of a "specific … service" (its business model)

for which it plainly has "an economic motivation." *See Greater Philadelphia

Chamber of Com. v. City of Philadelphia*, 949 F.3d 116, 137 (3d Cir. 2020).

Whether subjected to intermediate scrutiny as a content-neutral statute under

*United States v. O'Brien*, 391 U.S. 367, 377, 381 (1968), or as a regulation of

commercial speech under *Central Hudson Gas & Electric Corp. v. Public Service

Commission of New York*, 447 U.S. 557, 566 (1980), S3292 satisfies the test. Under

*O'Brien*, the law serves a paramount interest in protecting veterans from predatory

or substandard practices—a problem established by ample evidence below. And

S3292 is carefully tailored to those interests; licensing is the usual method that States

employ to prevent predatory or substandard providers from entering a commercial

marketplace, and it is designed to allow States to ensure providers meet basic

standards of honesty and competence. Similarly, under *Central Hudson*, the law

targets only illegal or misleading speech, and is tailored to the same powerful interests. While VG Consulting claims it does not engage in any "bad behavior," Br.46, its conclusory assertions do not entitle the business to as-applied relief; instead, the point of an accreditation regime is to ensure such promises are true, and to provide effective recourse if they later prove false.

B. Rudman and Soto are not likely to prevail on their petition and association claims. Initially, clients do not have an association- or petition-based right to services that a company has no right to provide under the Speech Clause. But in any event, neither right entitles an individual to hire any provider they choose, regardless of generally applicable laws such as accreditation requirements. Were it otherwise, then individuals could claim a right to hire and thereby associate with unlicensed lawyers to petition the courts—contrary to bedrock historical tradition.

II. Because Appellants are unlikely to prevail on the merits, this Court need not reach the other factors. In any event, Appellants' harm is wholly speculative, and the balance of equities weighs heavily in favor of New Jersey's law. New Jersey is free to join the Federal Government and other States in protecting veterans from predatory practices as they seek essential benefits.

## STANDARD OF REVIEW

A preliminary injunction "is an extraordinary remedy." *Frank's GMC Truck Ctr., Inc. v. Gen. Motors Corp.*, 847 F.2d 100, 102 (3d Cir. 1988). To be entitled to

that relief, a movant generally must show both "a reasonable probability of success on the merits" and "irreparable harm," though "the initial burden" as to success on the merits "is flipped" to the government in First Amendment cases. *Amalgamated Transit Union Local 85 v. Port Auth. of Allegheny Cnty.*, 39 F.4th 95, 102-03 (3d Cir. 2022). "If these 'gateway factors' are established," the court then balances these factors with two more: whether injunctive relief "would result in greater harm to the non-moving party," and whether such "relief is in the public interest." *Id.* at 103. A court must then determine whether "all four factors, taken together, balance in favor of granting the requested preliminary relief." *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017). In reviewing a denial of a preliminary injunction, including in First Amendment cases, this Court reviews a district court's "factual findings for clear error, its legal conclusions de novo, and its ultimate grant of the injunction for abuse of discretion." *Schrader v. Dist. Att'y of York Cnty.*, 74 F.4th 120, 126 (3d Cir. 2023); *see also, e.g.*, *Kim v. Hanlon*, 99 F.4th 140, 152 n.6 (3d Cir. 2024).

## **ARGUMENT**

### I.    AS THE DISTRICT COURT CORRECTLY HELD, APPELLANTS ARE UNLIKELY TO SUCCEED ON THE MERITS.

Across multiple professions, the "usual method" States employ for protecting their consumers from "the untrustworthy, the incompetent, or the irresponsible … is through a licensing system." *Thomas v. Collins*, 323 U.S. 516, 545 (1945) (Jackson, J., concurring). Yet despite States' "broad power to establish standards for licensing

18

practitioners and regulating the practice of professions," *Goldfarb*, 421 U.S. at 792, Appellants seek to upend that commonsense tradition. This Court can reject that demand the same way the district court correctly did: by recognizing that they have no likelihood of success on the merits, because S3292 violates neither Appellants' free-speech rights nor Rudman's and Soto's rights of petition and association.

### A.    S3292 Does Not Violate Appellants' Free Speech Rights.

Appellants are not likely to prevail on their free-speech challenge to S3292. First, as the district court recognized, S3292 does not burden protected speech at all. Second, even if it could be said to burden speech, S3292 would be subject to and would survive intermediate scrutiny. This law—no different, at bottom, from the bar-licensing requirements that permit attorneys to appear before this Court—is in no way contrary to the First Amendment or the values it protects.[2]

---

[2] While Appellants separately discuss VG Consulting's claimed right to speak and Rudman and Soto's claimed right to "'receive information and ideas' from" VG Consulting, Br.22 & 31-32 (quoting *Stanley v. Georgia*, 394 U.S. 557, 564 (1969)), the latter theory is wholly derivative. While the First Amendment does protect the "right to 'receive information and ideas,'" *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council*, 425 U.S. 748, 757 (1976), "[t]he listener's right to receive information is reciprocal to the speaker's right to speak," *Doe ex rel. Doe v. Governor of New Jersey*, 783 F.3d 150, 155 (3d Cir. 2015). In short, if S3292 does not violate VG Consulting's right to speak—and as explained below, it does not—it cannot violate Rudman and Soto's rights to listen. *Id.* The State thus addresses these claims together, focusing on VG Consulting's claim.

    1.    <u>S3292 Does Not Abridge Protected Speech</u>.

It is axiomatic that "[t]he power of government to regulate the professions is not lost whenever the practice of a profession entails speech." *Lowe v. SEC*, 472 U.S. 181, 228 (1985) (White, J., concurring in the judgment) (joined by Burger, C.J., and Rehnquist, J.). Consistent with that longstanding recognition, S3292 does not burden protected speech for two independent reasons. First, S3292 regulates conduct rather than speech—the conduct of charging customers money without obtaining the requisite licensure. Second, any speech S3292 incidentally regulates is unprotected speech integral to unlawful conduct because the unaccredited, for-profit work that VG Consulting seeks to perform would independently violate federal law.

    *i.*    *S3292 Regulates Conduct, Not Speech.*

By preventing VG Consulting from charging fees without first obtaining VA accreditation, S3292 regulates VG Consulting's conduct. A state regulation does not implicate the Free Speech Clause if its "effect on speech" is "only incidental to its primary effect on conduct." *Expressions Hair Design*, 581 U.S. at 47; *see also FAIR*, 547 U.S. at 62 ("[I]t has never been deemed an abridgement of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language."). That is true in the professional-licensing context too. *See Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 768 (2018) (*NIFLA*) (agreeing that "under our precedents, States may

20

regulate professional conduct, even though that conduct incidentally involves speech").

Multiple basic examples illustrate the point. One example, which the district court highlighted, JA14, involves pricing regulation: if New Jersey required all delis "to charge $10 for their sandwiches," that law would likely require each deli "to put '$10' on its menus or have its employees tell customers that price," which would be speech, but "the law's *effect on speech* would be only incidental to its primary effect on conduct." *Expressions Hair Design*, 581 U.S. at 47; *cf. also Walters*, 473 U.S. at 334-35 (rejecting First Amendment challenge to $10 fee limitation for VA claims assistance). That logic applies equally well to professional-licensing requirements—which regulate conduct by professionals, even if professional speech is incidentally impacted. *See, e.g.*, *Del Castillo*, 26 F.4th at 1220 (11th Cir.), *cert. denied*, 143 S. Ct. 486 (licensing for dieticians and nutritionists); *Cap. Associated Indus., Inc. v. Stein*, 922 F.3d 198, 207-08 (4th Cir. 2019) (corporations practicing law); *Young v. Ricketts*, 825 F.3d 487, 492-93 (8th Cir. 2016) (real-estate brokers); *Liberty Coins, LLC v. Goodman*, 748 F.3d 682, 697 (6th Cir. 2014) (precious-metal dealers); *Locke v. Shore*, 634 F.3d 1185, 1192 (11th Cir. 2011) (interior designers).

*Young* is illustrative. A California real-estate agent wished to assist clients in Nebraska advertise homes for sale in Nebraska. 825 F.3d at 490-91. But the agent was not licensed in Nebraska, so Nebraska law prohibited her from doing so. *Id.* In

response, the agent argued that her advertising qualified as "fully-protected First Amendment speech" and that requiring her to first obtain a license was "a content-based prior restraint on her First Amendment rights." *Id.* at 492. The Eighth Circuit rejected that argument, explaining that "no direct restriction of speech [was] at issue." *Id.* Rather, the "advertising" Young performed for her Nebraska clients "established that she engaged in the business of real estate broker, for compensation, without the license required by" Nebraska law. *Id.* Her theory thus failed under the "controlling" principle that "it has never been deemed an abridgement of freedom of speech … to make a course of conduct illegal merely because the conduct was in part initiated, evidence, or carried out by means of language." *Id.* (quoting *FAIR*, 547 U.S. at 62); *see also Cap. Assoc. Indus.*, 922 F.3d at 208 (explaining that while "the practice of law has communicative and non-communicative aspects," unauthorized-practice-of-law laws "don't target the communicative aspects of practicing law," but rather "focus more broadly on the question of who may conduct themselves as a lawyer").

The same principle applies here. As the district court correctly recognized, S3292 operates to prevent "unaccredited agents" from charging customers money for "unaccredited services." JA14. To be sure, those services involve speech—much as lawyering, real-estate advertising, psychotherapy, nutrition counseling, and many more services do. But S3292 has no quarrel with that speech, just as Congress—

which enacted the laws prohibiting the unlicensed claims assistance that VA lacks authority to enforce, *e.g.*, 38 U.S.C. § 5901; *see supra* at 9-10—does not. Instead, just as requiring professionals to pass the bar or the medical boards does not target legal or medical speech, S3292 focuses on conduct: it requires people who wish to make money helping veterans file disability claims to simply get accredited by VA.[3]

That States cannot target disfavored speech under the guise of compensation prohibitions, VG Br. 34-35, is a red herring. The State has never argued—and the district court never held—that a government that had effectively outlawed, *e.g.*, tobacco advertising by prohibiting companies from receiving compensation for it could avoid First Amendment scrutiny. Instead, that restriction would implicate free-speech law, an unremarkable proposition reflected in cases like *Pitt News v. Pappert*, 379 F.3d 96 (3d Cir. 2004), where the challenged law prohibited "'any advertising of alcoholic beverages' in virtually any medium of mass communication … affiliated with 'any educational institution.'" *Id.* at 102; *see also Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 108 (1991)

---

[3] VG Consulting does not challenge the federal regime, arguing only that their service does not fall within its scope. Br. 49-52. But it is unclear how the federal regime could be squared with VG Consulting's radical theory. After all, federal law undeniably requires accreditation before an individual can receive payment for professional services involving VA claims, *see* 38 U.S.C. § 5901(a); 38 C.F.R. § 14.629(b)(1), regardless of VG Consulting's quibbles about the metes and bounds of that prohibition. So if S3292 burdens speech, it is hard to see how VG Consulting believes the federal regime would not do likewise.

(restriction on accused or convicted criminal profiting from "works describing his crime"); *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 557 (2011) (restriction on sale or use for marketing of certain pharmacy records). But S3292's accreditation requirement is not a blanket prohibition on receiving compensation.  To the contrary, it requires would-be claims agents to go through the federal accreditation process, *see* 38 C.F.R. § 14.629(b)(1) (requiring determination of character, written exam, and CLE coursework), which VG Consulting has never suggested is either unduly arduous or unworkable. This restriction, in other words, is no different from the myriad other contexts in which States have exercised historic and "broad power to establish standards for licensing practitioners and regulating the practice of professions," *see, e.g.*, *Castille*, 799 F.3d 216, 221—a tradition that cases like *Pitt News* in no way call into question.[4]

VG Consulting's reliance (at 26-28) on *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010), and *King v. Governor of the State of New Jersey*, 767 F.3d 216 (3d Cir. 2014), is likewise confused. *Holder*, for instance, involved plaintiffs who wished to provide various forms of aid, including "legal training" and "advocacy," to two groups designated as "foreign terrorist organizations," but were barred from

---

[4] Notably, *Pitt News* subjected the statute in question to intermediate (*Central Hudson*) scrutiny, 379 F.3d at 106, not strict scrutiny. As explained below, even if this Court assumes S3292 burdens protected speech, intermediate scrutiny—which S3292 easily satisfies—is the proper standard. *See infra* at 28-35.

doing so by a federal law prohibiting the provision of "material support or resources" to such groups. *See* 561 U.S. at 10-11. As applied to the plaintiffs, the Court explained, that restriction prevented them not merely from engaging in the proposed conduct, but from "communicating a message." *Id.* at 28. After all, the plaintiffs wanted "to speak to" the terrorist groups, and whether they could under federal law "depend[ed] on what they say." *Id.* at 27. So too in *King*, which found that the First Amendment was implicated (though not violated) by a law that prohibited licensed counselors from engaging in "conversion therapy" with minors. 767 F.3d at 220, 225. The corollary here would be if New Jersey had prohibited any paid VA claims assistance based on the particular messages or methods used in that assistance. But requiring service providers to obtain accreditation—a process based on neutral qualifications, such as character and competency—has no bearing on what messages or methods duly-authorized providers use. That is consistent with *Holder*, *King*, and myriad professional-licensing requirements across this Circuit and the Nation.

  *ii. Any Speech Regulated Is Integral To Unlawful Conduct.*

  There is another reason that Appellants cannot show that S3292 burdens protected speech: any "speech" that would be covered is integral to unlawful conduct, namely, the violation of the federal regime that Appellants do not challenge here. This exception to First Amendment protection is well established. *E.g.*, *United States v. Hansen*, 599 U.S. 762, 783 (2023) ("Speech intended to bring about a

particular unlawful act has no social value; therefore, it is unprotected."). For example, while a measure that prohibits a business from advertising for a "Whites Only" job posting affects speech, "[a]ny First Amendment interest" is "altogether absent" because "the commercial activity itself is illegal and the restriction on advertising is incidental to a valid limitation on economic activity." *Pittsburgh Press Co. v. Pittsburgh Comm'n on Hum. Rels.*, 413 U.S. 376, 388-89 (1973). So too here: what VG Consulting seeks to do that would violate S3292 (collect fees for claims assistance without obtaining accreditation) would also be inextricably intertwined with a separate violation of federal law. If VG Consulting cannot do what it wishes to do under unchallenged U.S. law, it is unclear how New Jersey's decision to enforce violations of that regime could contravene the First Amendment.

Appellants' response is surprising. They do not challenge the federal law, nor do they explain how S3292 could abridge their protected speech if that speech is in furtherance of obtaining money for providing unaccredited services that federal law independently prohibits. Instead, Appellants merely dispute that federal law actually covers their precise business model. *See* Br. 49-52. But as VA itself has regularly maintained, federal law *does* cover that precise business model; after all, federal law makes it illegal for any entity to "act as an agent or attorney in the preparation, presentation, or prosecution of any [VA] claim … unless such individual has been" accredited by VA. 38 U.S.C. § 5901(a). And that fits VG Consulting's model, since

the company "advises veterans as they prepare to file their own claims" and "assists veterans with VA disability benefits claim submissions." Br. 6-7.

Appellants' sole response fails. VG Consulting claims (at 49-52) that it does not fit the term "agent" under federal law. But it is hard to understand how VG Consulting is not "act[ing] for" its clients, Br.50 (quoting Black's Law Dictionary (11th ed. 2019)), when its staff "review[s] relevant documents, help[s] develop supporting evidence, identif[ies] claim strategies, and assist[s] [them] with preparing and submitting their claims," Br.8. Indeed, VA itself has repeatedly reaffirmed that the "preparation" of a benefits claim includes "providing advice to veterans about the information needed to substantiate their claims" and the like, JA241, and where the agency has repeatedly stressed that "[a]dvising a claimant on a specific benefit claim or directing the claimant on how to fill out the application, even if you never put pen to paper, is considered claims preparation," JA290; *see also* Letter at 3 ("Because neither you nor your business are currently accredited by VA, you are prohibited by law from assisting veterans in the preparation, presentation, and prosecution of claims before VA."). VG Consulting misunderstands federal law.

That should be the end of the matter. S3292 merely enforces a separate federal regime that VG Consulting is already violating. VG Consulting accepts the validity of that regime in this case. As a result, given how VG Consulting chose to plead its case and to argue this appeal, VG Consulting cannot be entitled to the extraordinary

relief of a preliminary injunction under the theory that it has a First Amendment right to engage in speech inextricably intertwined with its own independent violations of an unchallenged federal law.

2.    Alternatively, S3292 Survives Means-End Scrutiny.

As the district court correctly held, even if S3292 regulates protected speech, the law is subject to and satisfies intermediate scrutiny. JA16-19. Appellants cannot identify a single appellate decision invalidating a similar requirement despite their prevalence, a telling indicator of the flaws in Appellants' extraordinary theory.

*i.    At Most, S3292 Is Subject To Intermediate Scrutiny.*

S3292 is content-neutral—it does not target speech based on the content of that speech, but rather based on whether the speaker is accredited—and thus at most is subject to intermediate scrutiny. *See* JA16 (citing *O'Brien*, 391 U.S. at 381). Alternatively, S3292 would be subject to a substantially similar form of intermediate scrutiny as a regulation of commercial speech, because all S3292 does is regulate the part of VG Consulting's business model that proposes a commercial transaction. *See Cent. Hudson*, 447 U.S. at 566; *see also S.F. Arts & Athletics v. U.S. Olympic Comm.*, 483 U.S. 522, 536 n.16 (1987) (applying *Central Hudson* and *O'Brien* forms of intermediate scrutiny "together" given their "substantially similar" application); JA16 n.8 (noting this "substantial[] overlap"). Appellants cite no case subjecting analogous licensing laws to strict scrutiny.

28

1. S3292 is content-neutral. A regulation of speech is "facially content based" if it "'target[s] speech based on its communicative content'—that is, if it 'applies to particular speech because of the topic discussed or the idea or message expressed.'" *City of Austin*, 596 U.S. at 69 (quoting *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015)). "Content neutral laws, on the other hand, do not regulate speech based on its content, but rather do so based on some other neutral characteristic of the speech." *Mazo*, 54 F.4th at 148. And a law can restrict speech in a content-neutral way even though applying that provision "may require some evaluation of the speech," *City of Austin*, 596 U.S. at 72, so long as the law itself "is 'agnostic as to content'" and thus "'requires an examination of speech only in service of drawing neutral' lines," *Mazo*, 54 F.4th at 149 (quoting *City of Austin*, 596 U.S. at 69)).

*City of Austin* is instructive. There, the Supreme Court confronted a First Amendment challenge to a municipal code distinguishing between signs that direct people to or otherwise promote "off-premises locations" (places not co-located with the sign) versus "on-premises locations" (places co-located with the sign). 596 U.S. at 65-66. A business brought a First Amendment challenge, emphasizing that one has to read the sign to determine application of the law, and a court of appeals agreed the law was content-discriminatory and subject to strict scrutiny on that basis. *Id.* at 67-68. But the Supreme Court decisively rejected the view that having to read the sign meant the law was content-discriminatory, highlighting that such an approach

would mean that "tens of thousands of jurisdictions have presumptively violated the First Amendment, some for more than half a century," a "bizarre result" "the Constitution does not require." *Id.* at 76. It thus rejected the argument "that any classification that considers function or purpose is always content based." *Id.* at 74.

Professional licensing laws likewise generally require "examination of speech only in service of drawing neutral lines." *Mazo*, 54 F.4th at 149 (quoting *City of Austin*, 596 U.S. at 69). Such licensing regimes, of course, are limited to the industry they cover and necessarily implicate such speech within that industry alone. But so long as the regime does not aim to suppress disfavored speech, the evaluation of the speech—to determine whether the professional is practicing law, giving medical advice, or providing therapy—serves the entirely neutral enterprise of requiring providers to be properly qualified. As this Court explained in rejecting challenges to Pennsylvania's attorney licensing rules, because the state-law regime itself did "not discriminate on the basis of the subject matter or viewpoint of any bar applicant's speech, the area of law an applicant would practice, or the clients an applicant would represent," the rule was "a content-neutral licensing requirement for the practice of law." *Castille*, 799 F.3d at 220-21. Said another way, even though it undisputedly applied only to professionals who engaged in legal speech, the licensing restriction was a permissible, content-neutral *qualification* regime. *Id.*; *see also, e.g.*, *Del*

*Castillo*, 26 F.4th 1214 (licensing for dieticians); *Young*, 825 F.3d 487 (real-estate brokers); *Locke*, 634 F.3d 1185 (interior designers).

*Brokamp*, 66 F.4th 374 (2d Cir. 2023), *cert. denied*, 144 S. Ct. 1095 (2024), which rejected a challenge to New York's licensing regime for mental-health counselors, is also instructive. *Brokamp* assumed without deciding that the licensing law burdened speech, *id.* at 392, but found the law content-neutral—notwithstanding that it required licensing only for counseling, and thus implicated counseling speech alone. After all, the measure "place[d] no limits or conditions on what a licensed counselor may hear and say in providing mental health counseling," and did "not license views it finds acceptable, while refusing to license less favored or more controversial views." *Id.* at 393-94. In short, the law did "not 'dictate what can be said' between a mental health counselor and client; it merely determine[d] 'who is qualified' as a mental health counseling professional." *Id.* at 394 (distinguishing *Otto v. City of Boca Raton*, 981 F.3d 854 (11th Cir. 2020)). That mattered. After all, the reason "that content discrimination is constitutionally proscribed [is] because it raises the specter that the Government may effectively drive certain ideas or viewpoints from the marketplace." *Id.* at 393. Neutral licensing laws raise no such concerns. *See id.* at 393-97 (discussing cases); *see also Nat'l Ass'n for Advancement of Psychoanalysis v. Cal. Bd. of Psych.*, 228 F.3d 1043, 1055 (9th Cir. 2000) (*NAAP*)

(finding content-neutral a state licensing law that did not restrict "unlicensed people from engaging in psychoanalysis if no fee is charged").

Appellants' contrary theory of content-discrimination is unworkable. On their theory, the mere fact that the federal accreditation regime applies to those providing VA-benefits services alone demonstrates that the law is discriminatory. *See* Br.35-37. But that would then be true of *any* requirement that applies to a single industry or context where speech occurs. *Cf. Reed v. Town of Gilbert*, 576 U.S. 155, 177 (2015) (Breyer, J., concurring in the judgment) (noting lack of apparent problem with "governmental regulation of securities; of prescription drugs; of doctor-patient confidentiality; of income tax statements; of commercial airplane briefings; of signs at petting zoos; and so on" (citations omitted)). New Jersey, for example, licenses lawyers, N.J. Stat. Ann. § 2C:21-22; psychologists, *id.* § 45:14-B-5; social workers, *id.* § 45:15BB-4; alcohol counselors, *id.* § 45:2D-8; and more. All of these professions involve speech, and asking whether an individual engages in that profession thus requires reviewing their speech to discern whether they are in fact doing so. Yet on Appellants' theory, unless the government regulates every profession all at once, in an entirely uniform way, it would face strict scrutiny. "[T]he Constitution does not require that bizarre result," *City of Austin*, 596 U.S. at 76, and

Appellants identify no appellate decision deeming such a professional-licensing regulation content-discriminatory.[5]

S3292 falls well within the tradition of content-neutral licensing, as the district court recognized. JA14-16, 18. Even assuming S3292 burdens speech, it is not targeting speakers because of any topic, idea, or message. *City of Austin*, 596 U.S. at 69; *compare Humanitarian Law Project*, 561 U.S. at 27. Instead, to the extent that S3292 and federal law alike "require[] an examination of speech"—to decide whether a person is providing claims assistance—it does so "in service of drawing [a] neutral" line between those offering unaccredited assistance and those not. *Mazo*, 54 F.4th at 149. And VA's accreditation process itself does not target disfavored speech either; it simply requires applicants to have the appropriate fitness and qualifications, and leaves agents free to discuss any topic or idea they wish. *See*

---

[5] One of Appellants' amici, Institute for Justice (IJ), identifies a handful of district court decisions, Br.19, but *Brokamp v. District of Columbia*, No. 20-3574, 2022 WL 681205 (D.D.C. Mar. 7, 2022), is a one-paragraph minute order; *Nutt v. Ritter*, ___ F. Supp. 3d ___, 2023 WL 9067799, at *11-14 (E.D.N.C. Dec. 20, 2023), addresses only a narrower application of the plaintiff's claim involving mere communication of opinions; and the remaining two decisions are pending appeal, *see Upsolve, Inc. v. James*, 604 F. Supp. 3d 97 (S.D.N.Y. 2022), *appeal docketed*, No. 22-1345 (2d Cir.); *Richwine v. Matuszak*, ___ F. Supp. 3d ___, 2023 WL 8747471 (N.D. Ind. Dec. 19, 2023), *appeal docketed*, No. 24-1081 (7th Cir.). IJ also cites *Pacific Coast Horseshoeing School, Inc. v. Kirchmeyer*, 961 F.3d 1062 (9th Cir. 2020), but that law "regulated what *kind* of educational programs different institutions can offer," *id.* at 1069 (emphasis added), and also left assessing the proper tier of scrutiny to the district court on remand, *see id.* at 1074, where the case apparently settled.

*Castille*, 799 F.3d at 221 (attorney-licensing regime that includes character evaluation is content-neutral). It is thus no different from any other content-neutral law that considers speech solely to determine whether an individual is operating within a particular professional field and consequently must have the relevant professional license.

2. In any event, because S3292 regulates only commercial speech, it would be subject only to *Central Hudson* regardless of whether it is content-neutral. *See City of Austin*, 596 U.S. at 68 n.3, 73. Commercial speech is "expression related solely to the economic interests of the speaker and its audience." *Cent. Hudson*, 447 U.S. at 561. As such speech "is 'linked inextricably' with the commercial arrangement that it proposes," the State's interest in regulating the transaction gives it "a concomitant interest in the expression itself," and commercial-speech restrictions are thus subject only to this "intermediate standard of review." *Edenfield v. Fane*, 507 U.S. 761, 767 (1993); *see also Cent. Hudson*, 447 U.S. at 562 (reasoning that commercial speech "occurs in an area traditionally subject to government regulation").

S3292 self-evidently flows from the State's underlying interest in regulating the commercial transaction. The "test for identifying commercial speech" is whether it "propose[s] a commercial transaction." *Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 473-74 (1989); *see also Bank of Hope v. Chon*, 938 F.3d 389, 395 n.† (3d Cir. 2019). To conduct that inquiry, this Court looks to three factors, though all

three "need not be present": (1) whether "the speech refer[s] to a specific product or service," (2) whether the speech is an advertisement, and (3) whether the speaker has "an economic motivation for the speech." *Greater Phila. Chamber*, 949 F.3d at 137 (ordinance prohibiting employers from asking about employee's wage history regulated only commercial speech).

Assuming VG Consulting's actions are speech, they fit the test for commercial speech. The only speech the statute plausibly regulates is VG Consulting's wish to charge money for providing claims assistance without obtaining accreditation. *See* JA77. That is a discussion of a "specific … service" to be sold to a client, for which VG Consulting of course has "an economic motivation." *Greater Phila. Chamber*, 949 F.3d at 137. Indeed, S3292 in no way regulates the general act of providing claims assistance; it does not even apply when such assistance is provided for free. The law is instead limited in scope: to convert assistance into a paid transaction, the provider must be accredited. To the extent that burdens speech, it burdens only the commercial aspect of that speech.

> ii.    *S3292 Satisfies Intermediate Scrutiny.*

Whether analyzed under intermediate scrutiny pursuant to the *O'Brien* test, 391 U.S. at 381, or under the similar scrutiny applicable to commercial-speech laws pursuant to *Central Hudson*, 447 U.S. at 566, New Jersey's law survives.

1. Although S3292 would satisfy any level of constitutional scrutiny, it easily satisfies *O'Brien*. A law satisfies such scrutiny "[1] if it furthers an important or substantial governmental interest; [2] if the governmental interest is unrelated to the suppression of free expression; and [3] if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." *O'Brien*, 391 U.S. at 377.

*First*, New Jersey—like the Federal Government and several other States that enacted such laws, *see supra* at 10—has a powerful interest in protecting veterans from being taken advantage of or ill-served by unaccredited entities. New Jersey's "interest in consumer protection is undoubtedly substantial," *Heffner v. Murphy*, 745 F.3d 56, 92 (3d Cir. 2014), and protecting consumers from substandard services is a common goal for licensing requirements across the country, *see Thomas*, 323 U.S. at 545 (1945) (Jackson, J., concurring) (noting licensing is the "usual method" to protect consumers from "the untrustworthy, the incompetent, or the irresponsible," and citing State's "duty to protect the public from those who seek for one purpose or another to obtain its money"); *cf. Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 434 (1982) ("New Jersey has an extremely important interest in maintaining and assuring the professional conduct of the attorneys it licenses."); *Va. Bd. of Pharmacy*, 425 U.S. at 768 (professional regulation can

bolster "high professional standards"); *Locke*, 634 F.3d at 1196 (licensing can help ensure adequate training).

That interest is particularly substantial in the context of VA disability claims, as the record here illustrates. In 2022, for instance, the FTC received over 195,000 complaints from veterans regarding fraud and illegal business practices. JA217. The harms are plainly linked to accreditation: between 2018 and 2022, approximately 40% of veterans' VA-related complaints were filed against unaccredited advisers and agents. JA217; *see also* JA529 (explaining that "DMAVA is aware of instances of such unaccredited actors targeting New Jersey veterans and their families, in some cases resulting in great financial loss to veterans and their families"); JA529-30 (observing that "these actors and companies prey upon vulnerable and unknowing veterans," and contrasting these unaccredited entities with VSOs, who provide services "entirely free of charge, and receive the necessary training to provide competent and effective assistance").

VG Consulting's claim that New Jersey's law does not serve a valid interest, Br.42-45 (citing, *e.g.*, *Edenfield*), misunderstands both the law and the record. The Supreme Court has made clear that a range of sources are permissible, holding that governments may "justify speech restrictions by reference to studies and anecdotes pertaining to different locales altogether, or even, in a case applying strict scrutiny, to justify restrictions based solely on history, consensus, and simple common sense."

*Fla. Bar v. Went For It, Inc.*, 515 U.S. 618, 628 (1995) (cleaned up) (affirming that "[n]othing in *Edenfield*, a case in which the State offered no evidence or anecdotes in support of its restriction, requires more"). And here, the State is relying on ample empirical data and other record evidence to substantiate interests behind the federal and state accreditation requirement, including the extensive record evidence of harm to veterans from unaccredited companies—evidence that the district court properly credited. *See* JA17-18. Still more, the State can also rely on support from "history, consensus, and simple common sense," including Congress's own longstanding decision to require accreditation. *See Goldfarb*, 421 U.S. at 792 (recognizing States' "broad power to establish standards for licensing practitioners and regulating the practice of professions"). Particularly because VA cannot enforce federal law, New Jersey has an especially strong interest in stepping in to do so.

*Second*, S3292 is—as the district court correctly observed—unrelated to the suppression of free expression because "its primary effect is to regulate the conduct of non-accredited agents receiving commissions for providing services, and those aims are unrelated to expression." JA18. As explained in detail above, *see supra* at 10-12, 29-34, S3292 disfavors no ideas, topics, or messages, but simply requires that a provider obtain VA accreditation before they charge veterans money for VA claims assistance. New Jersey's interests in protecting veterans and ensuring that those who

38

charge them for assistance have proper qualifications is scarcely related "to the suppression of free expression." *See O'Brien*, 391 U.S. at 377.

*Finally*, any incidental burden on speech is no greater than necessary to further these interests. A regulation satisfies *O'Brien* "so long as the … regulation promotes a substantial government interest that would be achieved less effectively absent the regulation," *Turner Broad. Sys. v. FCC*, 512 U.S. 622, 662 (1994); it need not be the least restrictive means. Here, S3292 is tailored to protecting veterans from predatory or substandard services. By prohibiting compensation for claims assistance "except as permitted under federal law," N.J. Stat. Ann. § 56:8-228(a)(1), S3292 tailors its coverage to the federal accreditation law—which focuses on an applicant's character (*e.g.*, not having been convicted of a felony, or a misdemeanor involving fraud, deceit, or theft) and their knowledge (*e.g.*, passing a written exam and taking CLE credits)—and provides for civil remedies if providers flout it. *See* 38 C.F.R. § 14.629(b)(1)-(3); *cf. Brokamp*, 66 F.4th at 399 (reasoning that "licensure based on specified standards of education, experience, and testing [have been] long recognized by the Supreme Court directly and materially to alleviate concerns about ignorant, incompetent, and/or deceptive health care providers"); *compare Billups v. City of Charleston*, 961 F.3d 673, 676, 688-90 (4th Cir. 2020) (striking down tour-guide licensing law where the ordinance imposed a "200-question written examination" and threatened "imprisonment" for giving an unlicensed tour, despite

ample alternatives). It restricts only paid, *unaccredited* assistance—an entirely modest (indeed, necessary) means of ensuring that those who enter the marketplace have the requisite competence and character. Without such safeguards, there would be limited recourse to address predatory or substandard services before it is too late—for instance, the accreditation regime is what allows VA to suspend a provider who "has engaged in any unlawful, unprofessional, or dishonest practice" or has "deceived, misled, or threatened" a client. *See* 38 U.S.C. § 5904(b)(1), (5).[6]

Nor can VG Consulting obtain a different result by promising it will behave responsibly. VG Consulting bases its as-applied challenge on the argument that the company "engages in none of the predatory behaviors New Jersey may have endeavored to remediate when it enacted S3292." Br.23. But it is unclear how that claim, even were it true, merits a constitutional exception from a generally applicable licensing law. An individual who claims legal knowledge cannot engage in the practice of law without passing the bar, just as those who promise to be responsible psychologists or real-estate agents may still be subjected to character-and-fitness requirements and written exams. Appellants do not identify any case in which a for-

---

[6] Indeed, for all these reasons, S3292 would satisfy even strict scrutiny, given the compelling nature of the State's interests and the lack of less restrictive alternatives. *See Greater Phila. Chamber*, 949 F.3d at 140 & n.167. If, however, this Court were to find that strict scrutiny applies (though it does not), this Court should remand to allow the district court to apply it in the first instance. *E.g.*, *Free Speech Coal., Inc. v. Att'y Gen. United States*, 825 F.3d 149, 164 (3d Cir. 2016).

profit company received a court-ordered exception from a licensing law simply by promising competency or good behavior—the very qualities for which the licensing process tests. *Compare Upsolve*, 604 F. Supp. 3d at 102-03 (district court decision issuing narrow as-applied relief to nonprofit entity that sought to train non-lawyers to provide free help to low-income New Yorkers facing debt-collection actions in "fill[ing] out checkboxes on a one-page answer form").

In any event, VG Consulting has shown no entitlement to as-applied relief. After all, VG Consulting engages in conduct that, as VA has repeatedly explained, violates federal law. JA241, 261-70. Indeed, the company is currently facing four suits related to excessive fees that it charged to veteran customers, and has received a cease-and-desist letter from VA regarding its conduct. *See supra* at 8-9; *see also* Lisa Rein, *Veterans Became Eligible For Billions. These Firms Saw a Chance to Profit.*, Wash. Post (May 23, 2024), https://tinyurl.com/5n83h6ed. And VG Consulting has never suggested that achieving accreditation would itself be difficult, offering only the conclusory assertion that it "cannot serve as an accredited agent" because it "focuses on initial claims." Br.15 n.1. Balanced against the record-based risks that veterans are facing from predatory or substandard providers, *see supra* at 7-9, VG Consulting is hardly entitled to a preliminary injunction granting it a special exception just because it describes itself as "responsible." Br.6, 45.

2. S3292 satisfies *Central Hudson* for substantially similar reasons. *See S.F. Arts & Athletics*, 483 U.S. at 536 n.16 (applying *Central Hudson* and *O'Brien* forms of intermediate scrutiny "together" given their "substantially similar" application); JA16 n.8 (same). This standard entails a four-part test. *See, e.g.*, *Bank of Hope*, 938 F.3d at 395. First, a court must ask [1] whether the speech in question "is misleading or concerns illegal activity"; if it is, the inquiry ends. *Id.* If, however, "the speech is lawful and not misleading, the restriction must satisfy three more prongs to survive": [2] there must be a substantial government interest; [3] "the restriction must directly advance that interest"; and [4] "the restriction must be no broader than necessary." *Id.* Much as under *O'Brien*, the Court in *Central Hudson* established that "the 'fit' between the proposed restriction and the government's interest need not be the least restrictive means"—it need only be "reasonable." *Greater Phila. Chamber*, 949 F.3d at 138.

S3292 satisfies *Central Hudson*. For one, any speech covered by S3292 "is misleading or concerns illegal activity," *Bank of Hope*, 938 F.3d at 395, for the same reasons it is unprotected as speech integral to unlawful conduct: VG Consulting's sale of unaccredited assistance violates independent federal law that Appellants have not challenged. *See supra* at 25-28. VG Consulting's speech is also misleading—it is predicated on a representation that its services are wholly legal, *see* JA527 ("Myth: Any unaccredited disability benefits consultant is acting illegally. Fact: Federal and

state laws DO NOT prohibit private claims consultants from assisting veterans with their disability claims.")—a representation with which VA expressly disagrees, JA241, 261-70. For another, even leaving aside these issues, S3292 would satisfy the remaining factors of *Central Hudson* for the precise reasons it satisfies *O'Brien*: S3292 advances the State's historic interest in protecting veterans from predatory or substandard services, and a "reasonable fit" exists between the State's consumer-protection interests and S3292's restriction on charging money without obtaining accreditation. *See supra* at 36-40; *Greater Phila. Chamber*, 949 F.3d at 138. S3292 satisfies either form of intermediate scrutiny.

### 3.    Appellants' Remaining Arguments Lack Merit.

The district court also properly rejected Appellants' conclusory allegation that S3292 is facially overbroad. JA21. Overbreadth invalidation is "strong medicine," warranted only where a law's unconstitutional applications are "substantial, not only in an absolute sense, but also relative to the statute's plainly legitimate sweep." *United States v. Williams*, 553 U.S. 285, 292-93 (2008). That means a claimant's burden is especially heavy: rather than merely hypothesize "some impermissible applications," *id.* at 303, it must demonstrate a truly "lopsided ratio" of real-world applications, *Hansen*, 599 U.S. at 770. Appellants cannot meet that burden.

Appellants' argument suffers from two independent flaws. First, overbreadth doctrine is inapplicable because S3292 at most regulates only commercial speech,

and "overbreadth doctrine does not apply to commercial speech." *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 497 (1982); *see also Rad v. Att'y Gen. U.S.*, 983 F.3d 651, 662 (3d Cir. 2020). Second, even if overbreadth applied, Appellants have not shown the "lopsided ratio" they would need to obtain this rare relief. *Hansen*, 599 U.S. at 770. Indeed, Appellants have not demonstrated a single unconstitutional application, let alone a disproportionately high number.

Appellants' only response—that because the State allegedly cannot establish narrow tailoring, no circumstances exist in which the law could be validly enforced, Br.46—gets them no further. To the extent this argument simply restates Appellants' broader facial theory, it fails for the reasons above. Beyond that, the argument seems to run counter to Appellants' acknowledgment that "those actually engaged in bad behavior" do exist, and it is unclear why S3292 could not "be constitutionally enforced" against such actors. *See id.*; *see also* IJ Br.21 (conceding that "most licensing laws will have enough applications not triggered solely by speech that facial invalidation would be inappropriate"). The district court was correct to reject this "last-ditch argument." JA21.

For similar reasons, Appellants get no further making brief references (at 28, 48) to N.J. Stat. Ann. § 56:8-228(a)(4) ("No person shall receive any compensation for any services rendered before the date on which a notice of disagreement is filed with respect to the individual's case."). Like subsection (a)(1) (the accreditation

requirement), this measure mirrors federal law's restriction on certain predatory fee structures, *compare* 38 U.S.C. § 5904(c)(1), and is therefore equally intertwined with VG Consulting's violation of unchallenged federal law, *see supra* at 25-28; JA281-82. Similarly, subsection (a)(4) is at most a content-neutral consumer law that "is agnostic as to content," that "requires an examination of speech only in service of drawing neutral lines," *Mazo*, 54 F.4th at 149, and that raises no "specter that the Government may effectively drive certain ideas or viewpoints from the marketplace," *Brokamp*, 66 F.4th at 393.  After all, the law applies on the neutral basis of whether a veteran has already received an initial denial and thus plausibly needs paid assistance in the first place. And it is commercial as well, as it restricts only a particular kind of fee request. *See Greater Phila. Chamber*, 949 F.3d at 137.

This restriction also serves key interests in a tailored way, and it is consistent with an especially significant history and tradition. As to the former, this provision protects veterans from being taken advantage of by ensuring that providers charge only for services veterans actually need—rather than benefits they can easily obtain regardless, without paying a hefty fee. *See, e.g.*, *Hoffmaster v. Veterans Admin.*, 444 F.2d 192, 193 (3d Cir. 1971) (per curiam) (rejecting challenge to $10 fee cap for claims agents, and reasoning that the cap was enacted "to protect just claimants from improvident bargains and to prevent unjust claims"). And it continues a history and tradition of protecting veteran beneficiaries from exploitative financial arrangements

that goes back to the founding. *See, e.g.*, *Walters*, 473 U.S. at 321-22 (describing the longstanding governmental interest in a system that prevents most beneficiaries from having to "divide" their awards "with a lawyer," and noting that this "is reinforced by a similar absolute prohibition on compensation of any service organization representative"); *Hines v. Lowrey*, 305 U.S. 85, 90 (1938) (observing that "Congress clearly intended to protect all veterans … against the imposition or payment of fees in excess of the amount fixed by statute"); *Hall*, 98 U.S. at 354 (noting, of regulations dating back to 1792, that "[m]ost … have been enacted to prevent agents, attorneys, and guardians from withholding the fund or converting the same to their own use before it passes into the hands of the beneficiary"); *cf.* Br.52 (noting 1862 fee cap without explaining why it would be constitutional). Appellants' brief, conclusory references to subsection (a)(4) grapple with none of this, and there is no infirmity.

**B.  S3292 Does Not Violate Individual Appellants' Petition Or Associational Rights.**

The district court rightly rejected Appellants right-to-petition and freedom-of-association claims. JA20. While Rudman and Soto enjoy a constitutional right to petition the government and to associate for that purpose, there is "extensive common ground in the definition and delineation of" free-speech and petition rights. *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 389 (2011). That makes sense: as the Supreme Court observed in the public-employee context, any other interpretation "would provide a ready means … to circumvent" existing free-speech doctrine via

creative pleading. *Id.* at 393. Appellants' joint petition-and-associational claims are thus unlikely to succeed for essentially the same reasons their free-speech claims are—the Petition Clause cannot create a right for a business to offer paid, unaccredited services that the business lacks under the Speech Clause. *See id.*

Beyond that basic problem, Rudman's and Soto's theories are mismatched with the rights they invoke. The Petition Clause guarantees protects Rudman's and Soto's rights to seek redress from the government, *see Borough of Duryea*, 564 U.S. at 388, but it does not grant them a right to retain any advocate they want. Indeed, even where the Constitution *obligates* "the Government to provide the services of an attorney," *Walters*, 473 U.S. at 332 (citing *Gideon v. Wainwright*, 372 U.S. 335 (1963)), the right does not go nearly that far, *see Ky. W. Va. Gas Co. v. Pa. Pub. Util. Comm'n*, 837 F.2d 600, 618 (3d Cir. 1988) ("[T]he right to counsel does not mean an absolute right to the lawyer of one's choice.").

Appellants own analogy illustrates their problem. Appellants claim that S3292 is "much like a law barring a potential litigant's access to a lawyer." Br.39. But that assertion proves the State's point: every State maintains some form of neutral bar-licensing requirement that limits who an individual may hire as their attorney. *See Castille*, 799 F.3d at 221. To the State's knowledge, none of those restrictions have ever been declared to violate a First Amendment petition or associational right, and Appellants cite no case suggesting that they have. But S3292 operates in the same

manner. S3292 does not prohibit Rudman or Soto from hiring claims agents to assist them, but merely limits the pool of permissible providers to accredited ones. Because VG Consulting has no free-speech right to disregard neutral accreditation laws, there is no petition or association right for their customers to invalidate them either.

Appellants' reliance on cases (Br.38-39) discussing the right to retain and/or to communicate with legal counsel is thus misplaced. *Feliz v. Kintock Grp.*, 297 F. App'x 131 (3d Cir. 2008) (per curiam), for instance, found that a detainee plausibly raised a First Amendment claim against a detention contractor for transferring him to another facility "in retaliation for his having contacted an attorney and public officials." *Id.* at 137; *see id.* at 138. *Denius v. Dunlap,* 209 F.3d 944 (7th Cir. 2000), simply restrained the State's ability to "compel the revelation of privileged attorney-client communications." *Id.* at 955. And *DeLoach v. Bevers*, 922 F.2d 618 (10th Cir. 1990), confirmed that government officials may not punish a criminal suspect "in retaliation for [her] decision to hire an attorney." *Id.* at 620; *see also United Mine Workers of Am., Dist. 12 v. Illinois State Bar Ass'n*, 389 U.S. 217, 224-25 (1967) (unions could not be barred from hiring attorneys to serve members); *Martin v. Lauer*, 686 F.2d 24, 27, 32 (D.C. Cir. 1982) (government could not require public employees to disclose certain communications made to their attorneys). S3292 does none of this—its terms leave all veterans free to retain paid claims assistance and to communicate with their providers freely, about any topic. Having a right to retain an

advocate does not trump neutral accreditation requirements. *See Walters*, 473 U.S. at 307-08, 334-35 (rejecting First Amendment challenge to $10 cap on VA agent fees and noting "numerous conceptual difficulties with extending" cases like *United Mine Workers* "to cover the situation here").

Similarly, although Appellants undisputedly have rights to associate for the purpose of engaging in First Amendment activity, *Roberts v. U.S. Jaycees*, 468 U.S. 609, 618 (1984), courts have never recognized a right for a consumer to frequent a particular commercial provider regardless of the latter's accreditation, *see, e.g.*, *Cap. Assoc. Indus.*, 922 F.3d at 205 (concluding "[s]olicitation of clients for commercial purposes" does not "implicate 'political expression or an exercise of associational freedom' or 'mutual assistance in asserting legal rights'" (citation omitted)); *cf. Scahill v. District of Columbia*, 909 F.3d 1177, 1186 (D.C. Cir. 2018) ("Appellants point to no authority that a cognizable liberty interest is implicated by the ban from one commercial establishment."). There is no basis to fashion a new associational right to hire any "professional consultant[]" that any customer wishes, irrespective of accreditation laws, under this rubric either. Br.39.

Finally, this is not a scenario in which assistance is sorely lacking. To be sure, Rudman and Soto feel that VG Consulting provides the "best" services and gives them the best chance "to achieve a successful result." *See* JA20; JA130 ¶ 12; JA133-34 ¶ 11. But these are their "subjective beliefs," JA20, and "veterans' organizations

across the country make available trained service agents, free of charge, to assist claimants in developing and presenting their claims," *Walters*, 473 U.S. at 311; *see* JA529-30. That two claimants lack faith in those free services falls far short of the showing needed to recognize a new constitutional right on a preliminary-injunction posture. *See id.* at 335 (observing that, even accepting plaintiffs' theory, "a First Amendment interest would attach only in the absence of a 'meaningful' alternative," which the existing VA claims process, despite its $10 fee cap, already provided).[7]

## II. THE EQUITABLE FACTORS ALSO CUT AGAINST GRANTING A PRELIMINARY INJUNCTION.

Because Appellants are not likely to succeed on the merits, this Court need not reach the remaining preliminary-injunction factors, just as the district court did not. JA21. Moreover, if this Court finds those factors necessary to consider, it should remand for the district court to perform the weighing in the first instance. *E.g.*, *Reilly*, 858 F.3d at 180; *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 712 (3d Cir. 2004). That said, each of those factors weighs heavily for affirmance as well.

---

[7] Indeed, Rudman's and Soto's belief that "veterans will … be unable to secure the benefits owed to them" without VG Consulting, Br.40, is contradicted by Rudman's own recent successful claim. Br.18 n.4. Though Rudman "credits his success to [VG Consulting]'s early assistance," *id.*, Rudman admits VG Consulting ceased working with him before it had even analyzed his responses to the company's questionnaire, JA130 ¶ 10—calling into question the relevance of VG Consulting's assistance.

## A.    Appellants Have Not Established Irreparable Harm.

To justify preliminary relief, Appellants must show that they "specifically and personally risk[] … irreparable harm" without it. *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 487 (3d Cir. 2000). Such harm cannot be speculative, and the "possibility of a remote future injury" is insufficient. *Acierno v. New Castle Cnty.*, 40 F.3d 645, 655 (3d Cir. 1994). Appellants have not met this burden.

To start, while Appellants claim to be suffering "constitutional injury," Br.52-53, that is not enough. Initially, "[c]onstitutional harm is not necessarily synonymous with the irreparable harm necessary for issuance of a preliminary injunction." *Hohe v. Casey*, 868 F.2d 69, 73 (3d Cir. 1989). Although the plurality in *Elrod v. Burns*, 427 U.S. 347 (1976), described a "loss of First Amendment freedoms" as irreparable harm, *id.* at 373, that case involved public employees who alleged that they had been fired or threatened with discharge for not supporting a particular political party, *id.* at 349-50, and this oft-quoted line thus "referred to the importance of the 'timeliness of political speech,'" *Matter of Felmeister*, 471 A.2d 775, 777 (N.J. 1984) (quoting *Elrod*, 427 U.S. at 374 n.29). "However, commercial speech is subject to different restraints and restrictions," *id.*, and so the irreparable injury at issue in *Elrod* does not automatically translate to an unlicensed business's inability to charge money for its services. Moreover, this claimed constitutional harm is particularly speculative in light of the parallel federal regime. Indeed, VG Consulting previously claimed to be

"actively seeking federal accreditation." JA527. While it now states that it "cannot" be accredited, that is simply because it refuses to comport with federal law—a law that would still restrict these activities no matter the result of this appeal. Any harm attributable to S3292 specifically is thus wholly speculative on this record.

Appellants' asserted economic injuries—the inability to do business in New Jersey, and Rudman's and Soto's inability to work with VG Consulting—are also insufficient. Economic injury is generally inadequate to establish irreparable harm, *e.g.*, *Frank's GMC Truck Ctr.*, 847 F.2d at 102, and Appellants' reference (at 53) to sovereign immunity does not automatically overcome that rule; "[t]hat the Eleventh Amendment may pose an obstacle to recovery of damages in the federal court does not transform money loss into irreparable injury for equitable purposes," *Black United Fund of N.J., Inc. v. Kean*, 763 F.2d 156, 161 (3d Cir. 1985). And, again, the movant must show that the alleged economic harm is non-speculative, *see Acierno*, 40 F.3d at 655—a burden Appellants have not satisfied, particularly because their economic actions would remain subject to federal law. That failure alone precludes preliminary relief. *See Amalgamated Transit*, 39 F.4th at 102-03.

### B.    The Equities Also Weigh Against Injunctive Relief.

When "the Government is the opposing party," the final two factors—"harm to the opposing party" and "the public interest"—merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). The extraordinary remedy Appellants demand makes their burden

especially heavy, because a State's "inability to enforce its duly enacted plans clearly inflicts irreparable harm on the State." *Abbott v. Perez*, 585 U.S. 579, 602 n.17 (2018).  But New Jersey's interest here stretches well beyond that general principle, as the State has an especially strong interest—continuing an "unchallenged practice" that dates back to the founding, *Hall*, 98 U.S. at 354—in protecting its veterans from predatory or substandard actors targeting their hard-earned benefits. *E.g.*, JA529-30; *see also Thomas*, 323 U.S. at 545 (Jackson, J., concurring) ("The modern state owes and attempts to perform a duty to protect the public from those who seek for one purpose or another to obtain its money."). VG Consulting's arguments ignore those interests, arguing only that they themselves act "responsibl[y]." Br.6, 45. But VG Consulting is violating federal law, *see supra* at 25-28, 40-41, and its interest in remaining unaccredited does not remotely outweigh the public's historic and powerful interest in protecting veterans from predatory and substandard services.

## CONCLUSION

This Court should affirm.

Respectfully submitted,

MATTHEW J. PLATKIN
ATTORNEY GENERAL OF NEW JERSEY

By:   /s/ Michael L. Zuckerman
      Michael L. Zuckerman
      *Deputy Solicitor General*

Dated: May 24, 2024

## COMBINED CERTIFICATIONS

I hereby certify that the following statements are true:

1. I am an attorney in good standing of the bar of the Third Circuit.

2. This brief complies with the typeface, type style and type-volume limitation requirements of Fed. R. App. P. 32(a)(5)-(7) because this brief has been prepared using 14-point type in Times New Roman, a proportionally spaced typeface, using Microsoft Word, and contains 12,995 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

3. The text of the paper copies that will be submitted and the PDF version of this brief being filed electronically with the Court today are identical.

4. Prior to this brief being electronically filed with the Court, it was scanned by MacAfee, Inc.'s Endpoint Security, version 10.7.0.3012, a virus-detection software, and found to be free from computer viruses. *See* L.A.R. 31.1(c).

5. On May 24, 2024, this brief was filed electronically with the Clerk of the United States Court of Appeals for the Third Circuit using the appellate CM/ECF system. Counsel for all parties are registered CM/ECF users and will be served via CM/ECF.

By:    /s/ Michael L. Zuckerman
Michael L. Zuckerman
*Deputy Solicitor General*

Dated: May 24, 2024